In re TRAFFORD DISTRIBUTING CENTER, INC. a/k/a Trafford Distribution Center, Inc., Debtor.

Soneet R. Kapila, Chapter 7 Trustee, Plaintiff,

v.

Richard I. Clark, as trustee for the Matthew Wortley Trust d/b/a X Co. Finance,

Richard I. Clark, as trustee for the Matthew Wortley Trust d/b/a X Co. Factoring Corp.,

Richard I. Clark, d/b/a X Co. Factoring Corp.,

Richard I. Clark, as trustee for the Matthew Wortley Trust d/b/a X Co. Factoring Corp.,

Richard I. Clark, d/b/a X Co. Finance,

Richard I. Clark, as trustee for Joseph M. Wortley Trust d/b/a X Co. Finance,

Richard I. Clark, as trustee for Joseph M. Wortley Trust d/b/a X Co. Factoring Corp.,

Richard I. Clark, d/b/a Matthew Wortley Trust,

Richard I. Clark, d/b/a Joseph M. Wortley Trust, Defendant(s).

Soneet R. Kapila, Chapter 7 Trustee, Plaintiff,

v.

Liberty Properties at Trafford, LLC, Liberty Associates, LC, and Advanced Vehicle Systems, LLC, Defendants.

Soneet R. Kapila, Chapter 7 Trustee, Plaintiff,

v.

Barbara Wortley, Defendant.

Bankruptcy No. 08–17980–BKC–JKO.

Adversary Nos. 08–01759–JKO, 08–01792–JKO, 08–01793–JKO.

United States Bankruptcy Court, S.D. Florida, Fort Lauderdale Division.

June 30, 2010.

Heather L. Ries, Esq., Marla B. Neufeld, Michael R. Bakst, Esq., West Palm Beach, FL, for Plaintiff.

Douglas C. Broeker, Esq., Miami, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN K. OLSON, Bankruptcy Judge.

## I. OVERVIEW

The Debtor filed for bankruptcy protection on June 13, 2008 and, before the year was out, the Chapter 7 Trustee filed four adversary complaints against various individuals and entities seeking to recover property for the benefit of the bankruptcy estate.[1] Each of the adversary proceedings has a substantial procedural history with roughly two hundred docket entries apiece. One of the adversary proceedings settled and was closed last month.[2]

The three adversary proceedings which remain seek to avoid preferential and fraudulent transfers pursuant to 11 U.S.C. §§ 547 and 548, and one seeks to recover damages resulting from alleged breaches of fiduciary duties. All three were tried concurrently pursuant to Fed. R. Bankr.P. 7042 due to substantial factual overlap. For the reasons stated below and pursuant to Fed. R. Bankr.P. 7058, I will enter separate final judgments in favor of Chapter 7 Trustee Soneet Kapila in each of the three adversary proceedings.

### I–A. Jurisdiction and Venue

I have subject matter jurisdiction under 28 U.S.C. § 1334(b) because all three adversaries are civil proceedings arising in and related to the bankruptcy estate. I also have subject matter jurisdiction under

---

1. *See* 08–01723–JKO [DE 1]; 08–01759–JKO [DE 1]; 08–01792–JKO [DE 1]; 08–01793–JKO [DE 1].

2. *See* 08–01723–JKO [DE 130, 132, 135].

§ 1334(e) because these adversary proceedings involve property of the Debtor's estate. This is a core proceeding under § 157(b) and venue is proper under § 1409.

## I–B. Background

The Debtor was incorporated under Florida law in September 2003. Defendant Barbara Wortley is its sole shareholder, officer, director, and registered agent. Its primary business was warehousing and it rented a warehouse owned by Defendant Liberty Properties at Trafford, LLC. The landlord was controlled by Mrs. Wortley's husband, Joseph G. Wortley, who also owned a printing services company, Liberty Source W, LLC.

Despite the apparently different business operations, the National Labor Relations Board found at least as early as July 2005 that the Debtor was the alter ego of Liberty Source W, LLC.[3] The Debtor was therefore required to remedy certain labor practices previously engaged in by Liberty Source W. The Debtor tried to settle with the NLRB, but these negotiations failed when the NLRB rejected the Debtor's offer of $200,000 and the Debtor rejected the NLRB's offer of $400,000.[4]

While the NLRB's claim against the Debtor as of the June 13, 2008 bankruptcy petition date was unliquidated, it was not contingent. The Third Circuit Court of Appeals concluded on February 26, 2007 that:

> The decisions by the [Administrative Law Judge] and the Board are supported by substantial evidence and the petition for review will be DENIED. The NLRB has requested summary enforcement against Liberty in light of the fact that Liberty did not file an answer to the complaint, appear at the Board hearing, file exceptions to the ALJ decision, or appeal its decision. Under Rule 15(b)(2) of the Federal Rules of Appellate Procedure, "[w]ithin 20 days after the application for enforcement is filed, the respondent must serve on the applicant an answer to the application and file it with the clerk." Fed. R.App. P. 15(b)(2). There is no indication that Liberty answered the NLRB's cross-petition for enforcement of the Board's order, and on that basis the petition for enforcement will be GRANTED.[5]

The NLRB's unliquidated but not contingent claim was then liquidated on July 31, 2009 for $1,671,492.96 in backpay and $500,612.31 in interest.[6] The Third Circuit subsequently issued a "Judgment Enforcing a Supplemental Order of the National Labor Relations Board" affirming the backpay and interest amounts due.[7]

**3.** *See Liberty Source W, LLC and/or Trafford Distrib. Ctr., its alter ego and Fed'n of Indep. Salaried Unions and Int'l Union of Electronic, Electrical, Salaried, Mach. and Furniture Workers–Commc'n Workers of Am., Local 601, AFL–CIO,* Cases 6–CA–33661 and 6–CA–33729, 344 NLRB No. 137, 344 NLRB 1127, 177 L.R.R.M. (BNA) 1331, 2005 WL 1767248 (N.L.R.B.) (July 22, 2005).

**4.** *See* 08–01792–JKO [DE 116], at 89–96.

**5.** *Trafford Distrib. Ctr. v. Nat'l Labor Relations Board,* 478 F.3d 172, 182 (3d Cir.2007), *cert. denied,* 552 U.S. 818, 128 S.Ct. 110, 169 L.Ed.2d 25 (2007).

**6.** *See Liberty Source W, LLC and/or Trafford Distrib. Ctr., its alter ego and Fed'n of Indep. Salaried Unions and Int'l Union of Electronic, Electrical, Salaried, Mach. and Furniture Workers–Commc'n Workers of Am., Local 601, AFL–CIO,* Cases 6–CA–33661 and 6–CA–33729, 354 NLRB No. 59, 186 L.R.R.M. (BNA) 1361, 2009 WL 2366517 (N.L.R.B.) (July 31, 2009).

**7.** *See Nat'l Labor Relations Board v. Trafford Distrib. Ctr.,* No. 09–4261 (3d Cir. Dec. 10, 2009).

The Defendants have repeatedly argued that I should not incorporate the $2.17 million NLRB judgment into my solvency determination for preferential and fraudulent transfer purposes, but I have repeatedly replied that I cannot entertain attempts to relitigate the NLRB findings. The Defendants would prefer that I use the $400,000 for which the NLRB apparently offered to settle, but the Defendants did not settle, the judgment is what the judgment is, and unfortunately for the Defendants the judgment is $2,172,105.27.

## I–C. Fact Issues at Trial

I attempted to narrow the issues in each of these adversaries, but was only able to do so in a substantial manner for adversary 08–01759–JKO (versus Richard I. Clark in his multiple capacities). Summary Judgment in that adversary left only the narrow issue of whether Mr. Clark owned an account receivable due from H.J. Heinz Company ("the Heinz Receivable") in any of his multiple capacities.[8] Rather than issue separate shorter findings and conclusions for the Clark adversary, I have chosen to issue this single opinion for all three adversaries. This is because the evidence in its entirety over the course of the two-day trial—particularly the credibility of Mr. Clark, Mr. Wortley, and Mrs. Wortley—was critical in gaining an overall sense of the multiple alleged oral trusts and Mr. Clark's role in the Wortleys' web of poorly documented entities. For reasons that will be more clearly articulated below, I conclude in adversary proceeding 08–01759–JKO that Mr. Clark did not own the Heinz Receivable in any of his multiple alleged capacities.

Regarding adversary proceeding 08–01792–JKO (versus Liberty Properties, *et al.*), I originally granted partial summary judgment on counts VIII, X, and XVI of the Amended Complaint,[9] but on the eve of trial I equivocated regarding the propriety of doing so for counts X and XVI.[10] I therefore heard evidence on both counts and, in an abundance of caution, will outline my factual determinations below. Nevertheless, I am now confident that partial summary judgment was proper for counts X and XVI and will decline to amend the summary judgment order.[11]

Finally, despite the great factual and legal overlap in these three proceedings, adversary proceeding 08–01793–JKO (versus Barbara Wortley) is procedurally wide open for fact findings as summary judgment was not entered on any counts. These Findings of Fact and Conclusions of Law will therefore first address the Barbara Wortley adversary before moving to the narrower issues in the Liberty Properties and Clark adversaries.

## I–D. Summary of Findings

The detailed fact findings in the following sections could be confusing because there are multiple adversary proceedings and business entities. The core finding is that the Debtor knew of its roughly $2 million exposure to the NLRB at all relevant times when each of the preferential and fraudulent transfers were made. The evidence in its entirety reveals that, while Barbara and Joseph Wortley may have understandably resented the NLRB telling them what to do, they nevertheless owned a shop subject to NLRB oversight and

---

8. *See* 08–01759–JKO [DE 165–66].

9. *See* 08–01792–JKO [DE 193].

10. *See* 08–01759–JKO [DE 187], at 12.

11. 08–01792–JKO [DE 193] (the motion for reconsideration at DE 208 will therefore be denied by separate order).

they did not follow the rules.[12] Their repeated reticence to grit teeth and do what was required under the applicable labor laws ultimately resulted in this bankruptcy filing and regrettable litigation.

First, the deposition testimony of Clyde Graham indicates that the NLRB told the Debtor in October 2005 that its exposure could exceed $2 million.[13] Barbara Wortley received various transfers from the Debtor from June 19, 2006 through June 6, 2008 which were characterized as management fees,[14] but testimony at trial established that Mrs. Wortley did not have a written management agreement with the Debtor.[15] The transfers ranged from just a few thousand dollars each to much larger amounts for a combined total of $130,000.00.[16]

Despite being the sole shareholder, officer, director, and registered agent for the Debtor, and despite testifying that she understood her duties and engaged in substantial management activity, Mrs. Wortley acknowledged that she only visited the Debtor's warehouse—its sole place of business—on two occasions between September 2003 and January 2010.[17] Mrs. Wortley testified that she intentionally did not rehire three employees that the NLRB asked her to rehire because it would have required her to fire three other employees whom she liked.[18] But Mrs. Wortley could not recall the names of the three employees whom she liked, nor the most senior employee whom she was required to rehire.[19] She testified at her Fed. R. Bankr.P. 2004 Examination that she only reviewed profit and loss statements "once in a while" and that her husband was the point of contact for managers of the Debtor.[20] Mrs. Wortley's husband appears to have had a great deal more involvement in managing the Debtor than Mrs. Wortley. Joseph G. Wortley was not an officer or director of the Debtor and held no formal position,[21] but he was Mrs. Wortley's alleged financial advisor and regularly received and reviewed the Debtor's profit and loss statements.[22] Interestingly, and despite the Defendants' unconvincing explanations of who owed what to whom at which times and how much was paid for what, Mr. Wortley once transferred $88,825.00 from the Debtor's account to Mrs. Wortley because—bottom line—he owed her money.[23]

As explained in section II below, I conclude that Mrs. Wortley was merely the titular head of the Debtor, provided little to no services or other value to the Debtor, and that Mr. Wortley used her figurehead status to suit his purposes. The $130,000 in "management fees" were transfers to an insider of the debtor within two years of the June 13, 2008 petition date and for

12. See, e.g., Trial Tr. Vol. I, at 152–153 (08–01792–JKO [DE 187]).

13. Pl.'s Ex. 34, at 27–28 (also at 08–01792–JKO [DE 172–1], at 9).

14. Pretrial Order, at 6 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]); see also Pl.'s Ex. 1.

15. Trial Tr. Vol. I, at 78 (08–01792–JKO [DE 187]).

16. See Pl.'s Ex. 11; (also at 08–01793–JKO [DE 51–4]).

17. Id. at 80–81, 108–109, 141–142.

18. Id. at 134–35.

19. Id. at 77, 134–36.

20. Id.

21. Id. at 71.

22. Pl.'s Ex. 30, at 22, 57 (also at 08–01793–JKO [DE 70], at 24, 59).

23. Trial Tr. Vol. I, at 124–28 (08–01792–JKO [DE 187]).

which the Debtor received less than reasonably equivalent value in exchange.

The $2.17 million NLRB judgment rendered the Debtor insolvent for fraudulent transfer purposes at least as early as the original July 2005 ruling. Using 20/20 hindsight, the Debtor may have been able to (and probably should have) settled the claim for $400,000—but this is irrelevant now because the Debtor did *not* settle despite being aware of its roughly two million dollar exposure as early as October 2005. I accordingly find that the $130,000 in management fees were fraudulent transfers to Mrs. Wortley under § 548 which are recoverable by the Chapter 7 Trustee. The February 12, 2008 transfer of $88,825.00 to Mrs. Wortley's account at Raymond James & Associates is even more clearly a fraudulent transfer under § 548 as I will explain below in section II.

Regarding the breach of fiduciary duty claims in adversary proceeding 08–01793–JKO, Mrs. Wortley is very well educated and I conclude that she fully understood her obligations as titular head of the Debtor. She nevertheless chose to ignore those obligations, was content to leave decision-making to her husband (who had no official responsibilities to the Debtor), and did not intervene even when his decisions were abysmal—intentionally and unnecessarily sparring with the NLRB and placing the Debtor on a course from perfectly decent business to a bankrupt Chapter 7 Debtor. She has therefore left herself open to very significant claims by the Chapter 7 Trustee for common law breaches of fiduciary duty. The separate Final Judgment which I will enter in adversary proceeding 08–01793–JKO will hold Defendant Barbara Wortley liable to Plaintiff Chapter 7 Trustee Soneet Kapila for the $218,825.00 in fraudulent transfers she received, plus $2,305,275.86 in damages resulting from her breaches of fiduciary duty, plus interest at the federal post-judgment interest rate from the date of final judgment until the funds are paid.

Regarding adversary proceeding 08–01792–JKO (versus Liberty Properties, *et al.*), I mentioned above that summary judgment was entered on counts VIII, X, and XVI [24] but nevertheless heard evidence on counts X and XVI. [25] Defendant Liberty Properties at Trafford, LLC was the Debtor's landlord, was owned by Mr. Wortley, and did not have a written lease agreement with the Debtor. [26] From June 2006 through May 2008, the Debtor paid $14,500 per month in rent to Liberty Properties, but in the month leading up to the Debtor's June 13, 2008 bankruptcy filing, the Debtor transferred $96,500.01 to Liberty Properties for alleged rent increases under a new lease purportedly dated and effective January 1, 2008. For reasons detailed below in section III, I find that the written lease (which ostensibly triples rent from $14,500 to $46,666.67 per month) was executed in the month leading up to the Debtor's bankruptcy filing in an attempt to substantiate what would be at best preferential rent payments (were I to believe the Wortleys), but in actuality was a willful and fraudulent attempt to drain the bankruptcy estate prior to filing. While the Defendants' Motion for Reconsideration [27] of my summary judgment order included an exhibit which gave me enough pause to hear evidence on counts X and XVI, [28] I am now convinced that the

24. *See* 08–01792–JKO [DE 193].

25. *See* 08–01759–JKO [DE 187], at 12.

26. *See* Pretrial Order, at ¶¶ 9, 34 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

27. *See* 08–01792–JKO [DE 208].

28. *See* 08–01792–JKO [DE 208–1].

exhibit was not properly before me and that summary judgment was proper. Even if the exhibit had been properly before me, the evidence at trial conclusively established that the Debtor's records included back-dated entries fashioned in anticipation of this bankruptcy.[29] Combined with my findings regarding the credibility of Mr. and Mrs. Wortley in this matter, I am not surprised that financial records would appear (much like the back-dated lease) to substantiate the Wortleys' version of events. I therefore discount the exhibit to the reconsideration motion as incredible and will detail my factual determinations on this issue below in section III.

The two other Defendants in adversary proceeding 08–01792–JKO are Liberty Associates, LC, and Advanced Vehicle Systems, LLC. Mr. Wortley is the managing member of Liberty Associates and Mrs. Wortley is the managing member of Advanced Vehicle Systems.[30] Liberty Associates received a $50,000 transfer from the Debtor on October 17, 2007, which the Wortleys claim was actually for rent owed to the landlord entity Liberty Properties at Trafford, LLC.[31] I find that there was no $50,000 rent shortfall in October 2007 and that the Wortleys' explanation is not credible. The Wortleys identically argue that a $15,000 transfer to Advanced Vehicle Systems on October 17, 2007 was actually for rent owed to Liberty Properties, and I identically find that it doesn't add up. Therefore, as explained below in section III, the separate Final Judgment which I will enter in adversary proceeding 08–01792–JKO will hold Defendants Liberty Properties at Trafford, LLC, Liberty Associates, LC, and Advanced Vehicle Sys-

tems, LLC liable to Plaintiff Chapter 7 Trustee Soneet Kapila for the various respective amounts preferentially and fraudulently transferred to those entities in the months leading up to the bankruptcy filing.

Finally, with regard to adversary proceeding 08–01759–JKO (versus Richard I. Clark in his multiple capacities), I find that the testimony of Mr. Clark, Mr. Wortley, and Mrs. Wortley was wholly unconvincing that the multiple alleged oral trusts are anything other than *ex post facto* fabrications designed to drain the bankruptcy estate and leave the NLRB judgment with recourse against an empty shell. For example, the UCC–1 which purportedly perfects the alleged security interest was filed on May 9, 2008 (about a month before the bankruptcy filing) in Pennsylvania. When I questioned Mr. Clark at trial regarding the specific nature of accounts receivable purchases and allegedly corresponding wire transfers, Mr. Clark gave little concrete information—much less than he should have had as a transactional attorney with thirty-eight years of practice were his story true. The lack of documentation and inability of witnesses to give me stories which reasonably add up leads me only to the conclusion that there was a lot of creative—albeit fraudulent—thinking going in May and early June of 2008. Whether the activity in anticipation of this bankruptcy filing was too creative or not creative enough, I find that Mr. Clark did not own the Heinz Receivable in any of his alleged capacities.[32] The separate Final Judgment which I will enter in adversary proceeding 08–01759–JKO will accordingly hold that the Chapter 7 Trustee holds

---

**29.** Trial Tr. Vol. I, at 45–60 (08–01759–JKO [DE 187]).

**30.** Pretrial Order, at ¶¶ 10–13 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**31.** Trial Tr. Vol. I, at 105 (08–01759–JKO [DE 187]).

**32.** *See* section IV below.

superior right, title, and interest in the Heinz Receivable, and that the asset is to be administered for the benefit of the bankruptcy estate.

## II. BARBARA WORTLEY

Barbara Wortley is the sole shareholder, president, officer, director, and registered agent for the Debtor, Trafford Distributing Center, Inc., a Florida corporation.[33] The Debtor was in the business of warehouse/fulfillment operations and occupied the warehouse property of Liberty Properties at Trafford, LLC, her husband's company.[34] Adversary proceeding 08–01792–JKO is a lawsuit against Barbara Wortley seeking to avoid and recover preferential and fraudulent transfers pursuant to 11 U.S.C. § 548, § 547, § 550 and Florida Statutes § 726, *et seq.*, totaling $218,825.00. Plaintiff Chapter 7 Trustee Soneet Kapila also seeks damages against Barbara Wortley for breach of common law fiduciary duty and for breach of fiduciary duty pursuant to Florida Statutes § 607.0830 and § 607.0831 in the amount of $2,305,275.86 as she caused the Debtor's insolvency resulting in this bankruptcy filing and damages to the Debtor and creditors in excess of that amount.

Prior to the bankruptcy filing, in a decision affirmed by the Third Circuit, the NLRB held that the Debtor was the alter ego of a former Wortley company, Liberty Source W, LLC. The Debtor was found to have been formed for the purpose of avoiding legal obligations under federal labor law to its alter ego's employees, including payment of obligations for severance pay,

accrued vacation pay, health care benefits, commissions due, and compensation to which the employees were entitled under collective bargaining agreements.

Mrs. Wortley, knowing that the Debtor's exposure for backpay owed by the Debtor could be as high as $2 million, recklessly or purposefully allowed several fraudulent transfers of the Debtor's assets to occur to insiders, including herself, within two years of the bankruptcy filing totaling $419,879.38. A majority of these transfers occurred within six months of the bankruptcy petition date. The transfers were designed to avoid payment of the debt owed to the NLRB, which would ultimately lead to the $2 million dollar judgment by the NLRB against the Debtor. As a result of Barbara Wortley's breach of fiduciary duty, she caused the Debtor's insolvency resulting in the bankruptcy filing and damages to the Debtor and creditors in excess of $2,305,275.86. This amount is the appropriate measure of damages for her breach of fiduciary duty to the Debtor and creditors, as will be explained below.

Before the Debtor filed its Chapter 7 Voluntary Petition on June 13, 2008, the National Labor Relations Board held that the Debtor was the alter ego of a former company, Liberty Source W, LLC.[35] The Debtor was therefore required to remedy certain labor practices engaged in by Liberty Source W, LLC.[36] In the month before the bankruptcy filing, the Debtor was engaged in settlement negotiations with the NLRB, but these failed when the NLRB rejected the Debtor's offer of

---

**33.** Pretrial Order, at ¶ 14 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**34.** *Id.* at ¶ 26.

**35.** *See Liberty Source W, LLC and/or Trafford Distrib. Ctr., its alter ego and Fed'n of Indep. Salaried Unions and Int'l Union of Electronic, Electrical, Salaried, Mach. and Furniture*

*Workers–Commc'n Workers of Am., Local 601, AFL–CIO,* Cases 6–CA–33661 and 6–CA–33729, 344 NLRB No. 137, 344 NLRB 1127, 177 L.R.R.M. (BNA) 1331, 2005 WL 1767248 (N.L.R.B.) (July 22, 2005).

**36.** *See id.*

$200,000 and the Debtor rejected the NLRB's offer of $400,000.[37]

The NLRB's claim as of the June 13, 2008 bankruptcy petition date was unliquidated, but not contingent. The Third Circuit Court of Appeals concluded on February 26, 2007 that the NLRB's petition for summary enforcement against the Debtor should be granted,[38] and the unliquidated but not contingent claim was then liquidated on July 31, 2009 for $1,671,492.96 in backpay and $500,612.31 in interest.[39] The Third Circuit subsequently issued a Judgment Enforcing a Supplemental Order of the National Labor Relations Board affirming the backpay and interest amounts due.[40]

The testimony of Clyde Graham reflects that the NLRB told the Debtor that its exposure in the litigation with the NLRB was in excess of $2 million as early as October 2005.[41] The evidence presented at trial reflects that NLRB's counsel, Joan A. Sullivan, sent a letter on May 8, 2008 to Trafford's counsel, John B. Bechtol, Esq. stating, "[w]hile an exact number has not been determined, the Region believes that the backpay [owed by the Debtor] could be as high as $2 million."[42] By the May 8, 2008 letter, the NLRB reaffirmed its rejection of Trafford's offer to settle with the NLRB for $200,000.00. According to a

May 13, 2008 letter, the NLRB was willing to settle its disputes with the Debtor for $400,000.00, however the Debtor refused to settle for this amount.[43] One day after the Debtor's receipt of the May 8th letter from the NLRB, Mrs. Wortley sought advice from the law firm of Furr and Cohen, P.A. and paid the firm a retainer.[44] On June 13, 2008, the Debtor filed the voluntary Chapter 7 bankruptcy petition which initiated this case. Mrs. Wortley testified at trial that she could pay the $400,000.00 from her personal funds, but she was not willing to comply with the terms which required the rehire of three employees designated by the NLRB.[45] Instead, Mrs. Wortley recklessly or purposefully allowed several fraudulent transfers of the Debtor's assets to occur to insiders within the two years leading up to the bankruptcy filing totaling $419,879.38. Of that amount, $218,825.00 was transferred to Mrs. Wortley herself.

## II-A. Transfers from the Debtor To Barbara Wortley

### II-A-1. Management Fees

Beginning on June 19, 2006 and continuing through June 6, 2008, Barbara Wortley received transfers of funds that were char-

37. See 08–01792–JKO [DE 116], at 89–96.

38. Trafford Distrib. Ctr. v. Nat. Labor Relations Board, 478 F.3d 172, 182 (3d Cir.2007), cert. denied, 552 U.S. 818, 128 S.Ct. 110, 169 L.Ed.2d 25 (2007).

39. See Liberty Source W, LLC and/or Trafford Distrib. Ctr., its alter ego and Fed of Indep. Salaried Unions and Int'l Union of Electronic, Electrical, Salaried, Mach. and Furniture Workers–Commc Workers of Am., Local 601, AFL CIO, Cases 6 A 3661 and 6 A. 3729, 354 NLRB No. 59, 186 L.R.R.M. (BNA) 1361, 2009 WL 2366517 (N.L.R.B.) (July 31, 2009).

40. See Nat. Labor Relations Board v. Trafford Distrib. Ctr., No. 09–4261 (3d Cir. Dec. 10, 2009).

41. Pl.'s Ex. 34, at 27–28 (also at 08–01792–JKO [DE 172–1], at 9).

42. Pl.'s Ex. 32, at 55, et seq. (also at 08–01793–JKO [DE 72], at 57, et seq.).

43. Pl.'s Ex. 32, at 52, et seq. (also at 08–01793–JKO [DE 72], at 47, et seq.).

44. Trial Tr. Vol. I, at 67, 102–03 (08–01759–JKO [DE 187]).

45. Id. at 152–53.

acterized as management fees,[46] but she did not have a written management agreement with the Debtor.[47] The fees were wire transferred from the Debtor to Mrs. Wortley, ranged from a few thousand dollars each to much larger amounts, and totaled $130,000.00.[48]

Mrs. Wortley was well aware of her obligations as titular head of the Debtor. She responded to questions from the Plaintiff's counsel as follows:

Q. Now, you would agree that as a director, president, that you would owe certain duties to the debtor corporation in that position?

A. Yes, that's correct.

Q. Okay, and you're familiar with the duties of a director because you're on a bank board, correct?

A. That's correct.

Q. Now, will you agree that among other things a director is to do is to perform certain corporate duties, that's one thing you do as a director?

A. That's correct.

Q. And you agree—would you not agree that a director had a duty to perform in good faith?

A. Yes.

Q. And would you agree that as a director you have a duty of care of an ordinary, prudent person that's in a like position, I'm sorry, let me rephrase it.

Would you not agree that as a director you have the standard of care that an ordinary, prudent person, in a like position, would exercise under similar circumstances.

\* \* \*

The WITNESS: I do understand that, yes.

BY MR. BAKST:

Q. And do you agree?

A. Yes.

Q. Do you agree that a director has a duty to act in a manner you reasonably believed to be in the best interest of the corporation?

A. That's correct.[49]

Mrs. Wortley also conceded at trial that she was responsible for everything that everybody did for the company.[50] Although Mrs. Wortley understood her duties as a director of the company, the evidence reflects that she did not fulfill these duties and, in fact, breached them.

When asked by the Plaintiff's counsel at trial what consideration she provided to the Debtor in exchange for the management fees she received, Mrs. Wortley responded as follows:

Well, I started the company, I made sure the company was well run, I put good managers in position, that I knew that were important to the company, I reviewed financial statement, I planned business strategy, I oversaw the existence of the company, I made sure they had legal representation.[51]

Although Mrs. Wortley testified that she generally did these things, the evidence demonstrates that she had very little involvement in the Debtor and was derelict

46. *See, e.g.,* Pretrial Order, at 6 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

47. Trial Tr. Vol. I, at 78 (08–01759–JKO [DE 187]).

48. *See* Pl.'s Ex. 11, at 8–19, 21–30, 32–33 (also at 08–01793–JKO [DE 51–4]).

49. *Id.* at 141–42.

50. *Id.* at 108–09.

51. *Id.* at 80–81.

and/or completely disregarded her duties as an officer and director.

Mrs. Wortley was the sole shareholder, president, officer director, and registered agent for the Debtor, but she did not know the address of the location where the Debtor housed its warehouse/fulfillment operations.[52] Mrs. Wortley testified that she had only visited the Debtor warehouse/fulfillment location on two occasions dating back to September, 2003.[53] She indicated that she did not rehire the three employees required by the NLRB because it would have required her to fire three other employees whom she liked.[54] However, when I asked Mrs. Wortley what the names of the employees were, she did not know even one of the employees' names:

THE COURT: What were their names?

THE WITNESS: I don't know. I met them, but I forget their names, but they were good employees, according to the management at the time, they were well liked, and they did their jobs well.

MR. BAKST: But you don't know one of their names?

THE WITNESS: I met them, and the names did not stay with me.

THE COURT: When did you meet them, ma'am?

THE WITNESS: When I visited the facility.

THE COURT: That was just after the facility opened in 2004?

THE WITNESS: Yes, it was in the spring of '04.

THE COURT: And all of those employees were there in the spring of '04?

THE WITNESS: Yes, there were several employees there in the warehouse.

THE COURT: The ones whose names you don't know?

THE WITNESS: That I cannot remember, that's true.

THE COURT: Thank you.[55]

Mrs. Wortley likewise did not know the name of George Kundrick, the most senior employee the NLRB had asked her to rehire.[56]

Despite the fact that her husband was not an officer or director of the Debtor and held no formal position with the Debtor,[57] Joseph Wortley was Mrs. Wortley's alleged financial advisor and regularly received and reviewed profit and loss statements for the Debtor. Mrs. Wortley testified at her Fed. R. Bankr.P. 2004 Examination that she only reviewed the Debtor's profit and loss statements once in a while, only spoke with the managers of the Debtor occasionally, and her husband was the point of contact for the Debtor's managers.[58] Mrs. Wortley also gave authority to Mr. Wortley to make wire transfers from the Debtor's bank accounts and she testified at trial that she believed that he was the person who directed the $88,825.00 transfer to her account at Raymond James & Associates in February 2008. Mr. Wortley transferred the $88,825.00 from the Debtor's account to Mrs. Wortley because he personally owed her money.[59] The evidence also re-

52. *Id.* at 80.

53. *Id.*

54. *Id.* at 134–35.

55. *Id.* at 135–36.

56. *Id.* at 77.

57. *Id.*

58. Pl.'s Ex. 30, at 22, 57 (also at 08–01793–JKO [DE 70], at 24, 59).

59. Trial Tr. Vol. I, at 78 (08–01759–JKO [DE 187]).

flects that Mrs. Wortley had no restraint with respect to her husband and his demands. This is evidenced by her entry into a new lease on behalf of the Debtor for a six month term at triple rent. I conclude that the written six month lease was actually executed in the month leading up to the June 2008 bankruptcy filing—and simply backdated to January as *ex post facto* justification for draining the bankruptcy estate prior to filing. But even if the lease had been executed in January, Mrs. Wortley testified that she did not do any investigation into new space and did not consult an attorney to negotiate the new lease despite the fact that it would triple the rent which had been paid for years under an unwritten lease agreement.[60]

Mrs. Wortley also failed to control the amounts being paid from the Debtor's accounts. The following exchange occurred between Plaintiff's counsel and Mrs. Wortley concerning the $207,500.02 in transfers to Liberty Properties at Trafford, LLC just prior to the bankruptcy filing:

Q. Were you aware of the fact that those transfers had occurred?

A. Yes, there was rent owed and needed to be paid.

Q. Did you direct those payments to be made?

A. I personally did not do that, no.

Q. Well, if you're the only officer and director, and—

A. Well there were other management people available at the facility.

Q. Who?

A. Well, Mr. Gates actually had to step in, after the May 8th letter, but he was not a paid officer of the company, but he did have authority to act

Q. Okay.

A. —as an officer.

Q. But you can't tell us today who the person even was that directed those payments to be made?

A. I'm not very—I'm not sure. They were made with my permission, and I gave authority to other people to pay what bills needed to be paid in the ordinary course of business.

Q. Well, these are—you would agree that these are rents payments for rent owed for previous months, won't you?

A. Yes, it was catch up rent, that's true.

Q. And did you make any effort, after you had already met with [bankruptcy counsel] and paid him the $10,000 retainer on or around May 9th, did you make any effort to direct any of the people running the operations of Trafford not to disburse out past due rent amounts to your landlord?

A. No, I did not.

Q. And there were payments, ma'am on May 28th, just over $32,000, $27,000 on June 4th, $5,166 on June 6th, and four days before the bankruptcy $32,166.67, that was all paid to Liberty Properties?

A. Uh-huh.

Q. We're talking now just over two weeks before the bankruptcy filing, but your testimony is that that was with your permission?

A. We owed them a lot of rent.[61]

And not only did Mrs. Wortley fail to control the Debtor's finances, she failed to participate in what a reasonable person in her position would consider to be very

60. *Id.* at 145–46.

61. *Id.* at 101–03 ("bankruptcy counsel" substituted for "Mr. Cohen").

important corporate matters. For example, she did not participate in mediation with the NLRB, whose claim she knew was significant to the Debtor's future and which she knew could result in a judgment against the Debtor in an amount in excess of $2 million.[62] Instead, Mrs. Wortley allowed Mr. Gates (a person who held no formal position with the Debtor and was an employee of one of her husband's companies) to attend the mediations and negotiate with the NLRB.[63] She did not include the NLRB claim in her business strategy for the Debtor.[64] She did not set aside any funds to settle the NLRB judgment but asserts that she would have personally loaned the Debtor money if a settlement amount needed to be paid.[65] The evidence reveals that, instead of attempting to fund a possible NLRB settlement for an amount substantially less than the two million dollar exposure, Mrs. Wortley allowed hundreds of thousands of dollars to be transferred from the Debtor to herself and other insider entities while negotiations with the NLRB were under way.

Finally, Mrs. Wortley testified that she did not have the Debtor file bankruptcy because it was insolvent, but rather because:

> . . . I just didn't want the headache, and the threats, and the legal fees. It just became too much for me to deal with, and I just said I don't want this business any more. They said I shouldn't have started it, I was a bad person for staring

this little fulfillment business, and I just didn't want to deal with it anymore, so I said, okay, I want out, I don't want this business any more.[66]

However, she did not even fulfill her obligations as titular head of the Debtor by reviewing and verifying the information provided on the Debtor's bankruptcy schedules prior to signing them.[67]

### II-A-2. Transfer to Barbara Wortley's Account at Raymond James & Associates

On February 12, 2008, $88,825.00 was wire transferred from the Debtor to Mrs. Wortley's account at Raymond James & Associates, and the transaction was reclassified as rent just before the June 13, 2008 bankruptcy petition date.[68] The Raymond James Transfer was not listed on the Debtor's Statement of Financial Affairs as a withdrawal from a partnership or distribution by a corporation, or anywhere else on the SOFA or Schedules which Mrs. Wortley signed under penalty of perjury. Mrs. Wortley did not direct the $88,825.00 transfer to her Raymond James account but testified that she believed her husband did.[69] She testified that the $88,825.00 transfer was made because Mr. Wortley owed her money,[70] and previously testified that the $88,825.00 transfer was for January Rent and the rent security deposit owed to the landlord entity.[71] At trial, she also testified that the $88,825.00 was for one month's rent, the security deposit, and

---

62. *Id.* at 81–84.

63. *Id.* at 72.

64. *Id.* at 81–84.

65. *Id.* at 95–96; 181; 191–92.

66. *Id.* at 151; *see also id.* at 152, 187–88, 195–96.

67. *Id.* at 86–94.

68. *See* Pl.'s Ex. 11, at 48; (also at 08–01793–JKO [DE 51-4] ).

69. Trial Tr. Vol. I, at 120–128 (08–01759–JKO [DE 187] ).

70. *Id.* at 120–21; 127–28.

71. *See* Pl.'s Ex. 28, at 113 (also at 08–01793–JKO [DE 51] ).

back rent of approximately $9,000.00—and instead of it being paid to her husband's landlord entity and then having her husband transfer it to her, it was transferred directly from the Debtor to her because Mr. Wortley owed her money and they did nothing more than short circuit the intervening steps. When I confronted her about this, however, she was not able to show how the $88,825.00 included those amounts through mathematical calculation.[72]

### II–B. Transfers from the Debtor to Liberty Properties at Trafford, LLC

Liberty Properties at Trafford, LLC was the Debtor's warehouse landlord and is owned by Mrs. Wortley's husband.[73] Prior to January 2008, the Debtor did not have a written lease agreement with Liberty Properties.[74] Sherry Bennett, one of the Chapter 7 Trustee's accountants, testified that rent was being paid in full by the Debtor to Liberty Properties:

From 2003 through December 2007, from the time the debtor opened its doors, to the end of 2007, it recorded its rent expense for exactly what was paid. So if the rent was $10,500, that what they paid the landlord, Liberty Properties, that what was recorded as rent expense. There was no recording of any amounts due above that.

So, if there were something if there were other amount of rent due, they were not recorded on the books and records of the debtor. They recorded it as it was paid, literally 10,500 rent expense, 14,500 rent expense. There was never any rent payable recorded on the books.[75]

The Debtor's General Ledger reflects that the Debtor was paying rent totaling $14,500.00 per month for every month from June 2006 through May 2008.[76] Although the rent being paid by the Debtor was allegedly below fair market value, Mrs. Wortley testified that the Debtor had trouble making the payments.[77]

After the Third Circuit affirmed the decision of the NLRB and despite the Debtor's trouble making the $14,500.00 rent payments, the Debtor (through Barbara Wortley) entered into a written lease allegedly dated January 1, 2008 which tripled rent to $46,666.67 per month.[78] Mrs. Wortley testified that she did not investigate into other space that the Debtor could lease and did not employ an attorney to help the Debtor negotiate the lease prior to tripling rent to her husband's company.[79]

Although the written lease indicates an effective date of January 1, 2008, the rent increase was not implemented at that time. Bill Gates provided a document titled "Trafford Distribution Center Summary Financial Statements (With Pro Forma Adjustments) 2005–2007" to the NLRB at a meeting on or about March 25, 2008.[80]

---

**72.** Trial Tr. Vol. I, at 122–125 (08–01759–JKO [DE 187]).

**73.** Pretrial Order, at ¶¶ 8–9 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**74.** *Id.* at ¶ 34.

**75.** Trial Tr. Vol. I, at 57 (08–01759–JKO [DE 187]).

**76.** *See* Pl.'s Ex. 11, at 8–20, 22–26, 28–30, 32 (also at 08–01793–JKO [DE 51–4]).

**77.** Trial Tr. Vol. I, at 131 (08–01759–JKO [DE 187]).

**78.** *Id.* at 116–17.

**79.** *Id.* at 145–146.

**80.** Pl.'s Ex. 32, at 34–36 (08–01793–JKO [DE 72]).

Page two of the document indicates current rent of $1.09 per square foot totaling $174,000 annually,[81] clearly indicating that rent as of the March meeting was $14,500.00 per month. Although the Wortleys claim that the written lease was effective January 1, 2008, the Debtor continued to pay $14,500.00 per month on January 11, 2008; February 6, 2008, March 11, 2008; April 9, 2008, and May 9, 2008.[82] Mrs. Wortley was unable to provide a satisfactory explanation for why $14,500.00 was paid for those months when there was allegedly a new lease executed in January under which the Debtor was required to pay $46,666.67.[83] I therefore find that the triple rent lease was not in existence before March 25, 2008 despite the Wortleys' claimed January execution date.

In the month leading up to the Debtor's June 13, 2008 bankruptcy filing, the Debtor transferred $96,500.01 to Liberty Properties for the alleged rent increases in January, February, and March of 2008.[84] If one looks back approximately three months prior to filing, the Debtor transferred additional funds (in the form of ledger entry debt reductions) to Liberty Properties totaling $64,333.34.[85] Looking back six months, the Debtor similarly transferred $46,666.67 to Liberty Properties.[86] Although the Debtor's General Ledger indicated that the above referenced transfers occurred on dates ranging from January 1, 2008 through May 1, 2008, the Plaintiff presented evidence at trial that all of the transfers actually occurred after May 9, 2008, within thirty-five days before the bankruptcy filing.[87] The evidence presented at trial, particularly the testimony of Sherry Bennett, demonstrated that the ostensible transaction dates did not match the sequential ledger transaction entries, and it was possible to determine that ordinary course ledger entry patterns suddenly shifted in early May with earlier-dated transactions receiving subsequently numbered ledger transactions IDs. I therefore find that all of these transfers were backdated within the Debtor's General Ledger sometime after May 9, 2008.

## II–C. Transfers from the Debtor to Liberty Associates, LC

Liberty Associates, LC is a Florida Limited Liability Company registered to do business in Florida, and Mrs. Wortley's husband is its managing member.[88] The parties agree that the Debtor transferred $50,000.00 to Liberty Associates on October 17, 2007,[89] but the transfer was not listed on the Debtor's Statement of Financial Affairs.[90] Liberty Associates claims that the $50,000.00 was on account of rent owed to Liberty Properties at Trafford, LLC.[91] The undisputed record evidence,

81. *Id.* at 110–11.

82. *See* Pl.'s Ex. 11, at 28–30, 32 (08–01793–JKO [DE 51–4]).

83. *See* Trial Tr. Vol. I, at 117–188 (08–01759–JKO [DE 187]).

84. Pretrial Order, at ¶ 36 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

85. *See* Trial Tr. Vol. I, at 48–49, 57–58 (08–01759–JKO [DE 187]); Pl.'s Ex. 11; Pl.'s Ex. 12; Pl.'s Ex. 13.

86. *See* Pl.'s Ex. 11; Pl.'s Ex. 12; Pl.'s Ex. 13.

87. *See* Trial Tr. Vol. I, at 49–58 (08–01759–JKO [DE 187]); Pl.'s Ex. 12.

88. Pretrial Order, at ¶ 10 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

89. *Id.* at ¶ 37.

90. Pl.'s Ex. 1.

91. *See* Trial Tr. Vol. I, at 105 (08–01759–JKO [DE 187]).

however, is that there was no $50,000.00 rent shortfall reflected in the Debtor's General Ledger as of October 2007.[92]

The Defendants questioned the Trustee's accountant, Mrs. Bennett, about the Defendants' Exhibit "DD," which was ostensibly a schedule of rents due from 2003 through 2008.[93] Mrs. Bennett testified that it was not a record of the Debtor and it was not prepared by Kapila & Company.[94] She further testified about the inaccuracies set forth in the exhibit.[95] The Defendants did not seek to introduce it into evidence, and the undisputed record evidence before me is that the Debtor was current in its rent obligations to Liberty Properties at the time of the $50,000.00 transfer to Liberty Associates. I will therefore decline to amend the summary judgment order at Docket Entry 193 in adversary proceeding 08–01792–JKO, and will deny the motion for reconsideration at Docket Entry 208 by separate order. But even if Exhibit DD were properly before me, it was thoroughly discredited by Mrs. Bennett's testimony. The numerous discrepancies in the document were troubling. I find myself unable to conclude that Exhibit DD has much probative weight because, in the context of this case as a whole, I am simply not surprised that a document would conveniently appear purporting to support the Wortleys' incredible version of events. I do not know who manufactured this false document but I am satisfied that it was part of a general scheme to defraud this Court. I therefore find that Liberty Associates provided no

direct benefit to the Debtor in exchange for the $50,000.00 it received.

## II–D. Transfers from the Debtor to Advanced Vehicle Systems, LLC

Advanced Vehicle Systems, LLC is a Florida Limited Liability Company registered to do business in Florida, and its managing member is Mrs. Wortley.[96] Advanced Vehicle Systems is an insider of the Debtor pursuant to 11 U.S.C. § 101(31)(A)(1) and Florida Statutes § 726, *et seq.*[97]

On April 13, 2007, the Debtor transferred $15,000 to Advanced Vehicle Systems,[98] and the transfer was not listed on the Debtor's Statement of Financial Affairs.[99] Advanced Vehicle Systems argues (identically to Liberty Associates) that this was on account of rent owed to Liberty Properties and the Debtor thus received reasonably equivalent value. As I explained above in sections II–B and II–C, the evidence before me is that there was no shortfall in rent and the Debtor was current in its rent obligations to Liberty Properties at the time of the $15,000.00 transfer to Liberty Associates. I therefore find that Advanced Vehicle Systems provided no direct benefit to the Debtor in exchange for the $15,000.00 it received.

## II–E. The Debtor Was Insolvent When the Above Transfers Were Made.

██ Under 11 U.S.C. § 547(f), "the debtor is presumed to have been insolvent

---

92. *See* Pl.'s Ex. 11, at 8–20, 22–26, 28–30, 32–33 (08–01793–JKO [DE 51–4]).

93. *See* Trial Tr. Vol. II, at 504 (08–01759–JKO [DE 186], at 225).

94. *Id.* at 505.

95. *Id.* at 506–512.

96. Pretrial Order, at ¶¶ 12–13 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

97. *See id.* at ¶ 13.

98. *Id.* at ¶ 38.

99. Pl.'s Ex. 1.

on and during the 90 days immediately preceding the date of the filing of the petition." The Defendant did not present any expert testimony at trial to rebut insolvency because these experts and their reports were stricken by my December 7, 2009 Order Granting Motion to Strike at Docket Entry 167 in adversary proceeding 08–01793–JKO. I reaffirmed that ruling on the first day of trial before hearing evidence.[100]

Florida and other jurisdictions permit owners to testify regarding value.[101] Barbara Wortley owns the Debtor and is not an expert on value or insolvency, but I nevertheless permitted her to opine on the value of the company and whether it was insolvent. Mrs. Wortley, of course, testified that she did not believe that the Debtor was insolvent at the time of the transfers at issue,[102] but I do not find her testimony to be credible or persuasive.

The Debtor's attorney in the NLRB litigation, Bechtol, stated in an April 11, 2008 letter to the NLRB that, "[a]t no time, during any of the relevant proceedings has any party to the referenced litigation believed that my client has or had the ability to satisfy the entire Third Circuit Court Judgment."[103] Mrs. Wortley admitted that Mr. Bechtol had the authority to make representations on behalf of the Debtor.[104] And although Mrs. Wortley believed that the Debtor would have to pay $400,000.00 to settle the NLRB matter, at no time did she set aside any of the Debtor's funds to pay the NLRB.[105] It was clear

from Mrs. Wortley testimony that the Debtor did not have the $400,000.00 that Mrs. Wortley anticipated the Debtor would have to pay, and the only way the Debtor would be able to pay the lump sum of $400,000.00 would be with a loan from Mrs. Wortley's personal funds.[106] The Defendant attempted to provide evidence via Mrs. Wortley that the Debtor was paying its bills as they came due, but this was ineffective. Defense counsel asked Mrs. Wortley, "Were there any bills that Trafford had that it hadn't paid at the time that it filed for bankruptcy?"[107] Mrs. Wortley responded, "There were—I believe there were no—we paid all our bills, yes."[108] On re-direct, however, Plaintiff's counsel confronted Mrs. Wortley with the Debtor's bankruptcy schedules which she signed under penalty of perjury and posed the following questions:

Q. Would you turn to Exhibit 1 in the binder in front of you please?

I'd like to ask you—that's the schedules.

Do you recall testifying that there were no bills that were unpaid when this bankruptcy was filed, other than perhaps the NLRB, do you recall answering that question?

A. I recall as far as I knew, I believe I said.

Q. Well your attorney asked you that question. You said that there were no unpaid bills.

A. Okay, not that I know of.

100. *See* Trial Tr. Vol. I, at 33 (08–01759–JKO [DE 187] ).

101. *See, e.g., Bloodsaw v. State,* 994 So.2d 378, 380 (Fla.3d D.C.A.2008).

102. *See* Trial Tr. Vol. I, at 185, 193 (08–01759–JKO [DE 187] ).

103. Pl. Ex. 23; *see also id.* at 137–38.

104. *Id.* at 138.

105. *See* Trial Tr. Vol. I, at 94–96, 186 (08–01759–JKO [DE 187] ).

106. *Id.* at 181, 191–92.

107. *Id.* at 186.

108. *Id.*

Q. I want you to look at Page 20 of 59. This is where we start with the Schedule F of this debtor.

* * *

Q. And we can go through, I understand you list certain amounts you dispute. We can start with Aqua Filter Fressh, is $82, that appears to be unpaid, April and May. Do you still have the same position that there were no unpaid bills?

A. I don't know about that one.

Q. Okay. Well, you signed these schedules, so you believed it to be an amount that was due, did you not?

A. I believe this was—I believe the information was gathered correctly, yes.

Q. As an amount that as due and unpaid, correct?

A. Well, that's what it says.

Q. Turn to Page 22 of 59, another creditor, something Tree Experts, $71, that would be another one that was due and not paid, would you agree, ma'am?

A. That's what it says.[109]

Although these amounts are extremely small, the entire testimony showed that Mrs. Wortley was unfamiliar with the Debtor's financials. I find that her titular status as head of the Debtor was just that, she did not have enough knowledge to testify regarding the Debtor's financial condition, and she was not credible regarding whether the Debtor was paying its debts as they came due or was actually insolvent. For example, Mrs. Wortley testified that she believed the Heinz Contract

was worth more than $1.2 million per year starting in 2008 because the Debtor was renegotiating it to include extra business and extend it for another 10 years.[110] She then admitted that the contract for increased work and refrigeration never occurred.[111]

The NLRB filed its original proof of claim in this case on July 29, 2008 for $1,671,580.00 in backpay and $500,693.00 in interest. That claim was then amended on December 30, 2009 to reflect the final judgment amounts of $1,671,492.96 in backpay and $500,612.31 in interest. The Defendants argue that this debt should not be included in the insolvency calculus, or that I should use the reduced amount of $400,000.00 which the NLRB would have accepted had the Debtor not rejected the NLRB's settlement offer. The fact is that the Debtor did reject the NLRB's settlement offer,[112] and the amount of the debt has been quantified by the Third Circuit's "Judgment Enforcing a Supplemental Order of the National Labor Relations Board" outlined above. I cannot use the $400,000.00 amount in my determination because that is not the amount of the debt now, was not the amount of the debt on the petition date, and the Debtor was on notice that "[w]hile an exact number has not been determined, the [NLRB] believes that the backpay [owed by the Debtor] could be as high as $2 million."[113] The Debtor knew as early as 2005 that its exposure was much greater that $400,000 as set forth in the testimony of Clyde Graham from the National Labor Review Board:

---

109. *Id.* at 193–95.

110. *Id.* at 177.

111. *Id.* at 190–91.

112. As Bette Davis said to Joan Crawford in *Whatever Happened to Baby Jane,* "But you are Blanche, you are."

113. Pl.'s Ex. 32, at 95 (also at 08–01793–JKO [DE 72] ).

A: Mediation transpired, I believe, in October of 2005.

Q: And was mediation successful?

A: No.

Q: There are numbers conveyed to [Debtor's counsel]. Do you recall what those numbers were?

\* \* \*

A: I did not provide him a specific calculation, but I guesstimated that the interest would elevate the back pay to in excess of $2 million.[114]

As a result of the foregoing, the Defendants have failed to carry their burden to rebut insolvency pursuant to 11 U.S.C. § 547(f) during the ninety (90) days prior to the bankruptcy filing.

Moreover, even if there were no presumption pursuant to § 547(f), I find that the Debtor was insolvent as early as July 22, 2005 as a result of the entry of the decision by the National Labor Relations Board.[115] At trial, Plaintiff Chapter 7 Trustee Sonnet R. Kapila testified as his own expert witness on the issue of solvency. In his opinion, the Debtor was insolvent on June 14, 2006, and at all times through June 13, 2008.[116] Although not set forth in Mr. Kapila's report, Mr. Kapila testified that the Debtor would have been insolvent at all times from June 14, 2006 through June 13, 2008, even if the NLRB claim were as low as $200,000.00. I posed the following questions to Mr. Kapila:

THE COURT: Under the company's book numbers, they say that on June 14, 2006, the company was solvent to the extent of $120,000.00. Let's assume that the NLRB amount could be settled for any number—for $300,000. Would the company have been insolvent at that date?

THE WITNESS: I wish to correct my response to your earlier question.

If you assume a settlement at $350,000, on June 14, 2006, the company would be insolvent, because the $350,000 would dissipate what is shown as the net assets of $120,000.

Going into December 2006, again, the company would be insolvent, even with a $350,000 settlement amount. The same applies to December 31, 2007, and the same applies to June 13, 2008, Judge.

THE COURT: Indeed, if the number were as low as $200,000 on the obligation to the NLRB, the company would have been insolvent on each of the four dates that you referenced; is that correct?

THE WITNESS: That is correct, Judge.[117]

I further inquired whether there were "any off-the-balance-sheet assets that could explain—that are not included, or an overstatement of liabilities." Mr. Kapila responded:

The non-balance sheet recorded asset, which normally would not be recorded in the normal scheme of things, but would be, and if there's value to it, for an insolvency analysis.

114. Pl.'s Ex. 34, at 27–28 (also at 08–01792 [DE 172]).

115. *See Liberty Source W, LLC and/or Trafford Distrib. Ctr., its alter ego and Fed'n of Indep. Salaried Unions and Int'l Union of Electronic, Electrical, Salaried, Mach. and Furniture Workers–Commc'n Workers of Am., Local 601, AFL–CIO,* Cases 6–CA–33661 and 6–CA–33729, 344 NLRB No. 137, 344 NLRB 1127, 177 L.R.R.M. (BNA) 1331, 2005 WL 1767248 (N.L.R.B.) (July 22, 2005).

116. *See* Trial Tr. Vol. II, at 288–96 (08–01759–JKO [DE 186], at 225); Pl.'s Ex. 13.

117. *Id.* at 302–03.

I bring up the Heinz contract. One has to look at the contract carefully, and whether you can actually add it to a valuation for insolvency purposes in terms of transferability. I don't think you can ignore transferability at all.

Even if you take that into account, you have to ask yourself is it truly in the market forces that are governing that company as a going concern at that time, can you actually treat that company as a going concern that somebody will pay a market price for with the NLRB claim hanging over its head.

The point I'm making, Judge, is, I don't think you can look at it just unilaterally as a single line item asset. You have to look at it in the totality of the company. Just to sell the contract has some transferability restrictions.[118]

Based on the foregoing, the Debtor was insolvent on June 14, 2006 and at all times through June 13, 2008, but I find that the Debtor was insolvent as early as July 22, 2005 when the NLRB ruled. That the intervening decisions made for the Debtor between then and now could have rendered the NLRB ruling less detrimental is, unfortunately, irrelevant now.

## II–F. The Plaintiff's Claim for Avoidance and Recovery of Fraudulent Transfers Against Barbara Wortley for $218,825.00 Pursuant to 11 U.S.C. § 548 (Adversary Proceeding 08–01793–JKO: Count I)

█ The Plaintiff has sought to avoid and recover fraudulent transfers to Barbara Wortley pursuant to 11 U.S.C. § 548, which provides that a trustee may avoid any transfer of property made within two years before the petition date if there was:

(A) actual intent to hinder, delay, or defraud creditors; or (B) a constructive fraudulent transfer. Constructive fraudulent transfers of property interests occur when the debtor received less than reasonably equivalent value in exchange and the debtor: (I) was insolvent on the date of the transfer; (II) was left with unreasonably small capital for then-existing or anticipated business activities; (III) intended to incur or believed it was incurring debts beyond its ability to timely repay; or (IV) made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course.[119] As discussed above, the Debtor was insolvent on June 14, 2006 and at all times through June 13, 2008. Because the transfers to Barbara Wortley took place after June 14, 2006 while the Debtor was insolvent, I need only address (i) whether the transfers were made with the intent to hinder, delay, or defraud creditors and (ii) whether the Debtor received less than reasonably equivalent value for those transfers.

## II–F–1. Avoidance and Recovery of Fraudulent Transfers to Liberty Properties Pursuant to 11 U.S.C. § 548(a)(1)(A)

Section 548(a)(1)(A) authorizes the trustee to avoid and recover any transfer that the Debtor made within the two years before its bankruptcy filing where the transfer was made with the actual intent to hinder, delay, or defraud any creditor. The Debtor filed its bankruptcy petition on June 13, 2008 and therefore, pursuant to § 548(a)(1)(A), the trustee may avoid any fraudulent transfers made by the Debtor on or after June 13, 2006. The Plaintiff Chapter 7 Trustee has met his burden of proof that the transfers to Barbara Wort-

---

118. *Id.* at 305–06.

119. *See* 11 U.S.C. § 548(a)(1).

ley were fraudulent by a preponderance of the evidence.[120]

Courts generally rely upon certain well-defined badges of fraud or indicia of fraud to presume fraudulent intent.[121] The same general analysis applies under both § 548(a)(1) and Chapter 726 of the Florida Statutes. The text of Fla. Stat. § 726.105 provides that the following eleven factors are to be considered in assessing the validity of a transfer:

(a) The transfer or obligation was to an insider;[122]

(b) The debtor retained possession or control of the property transferred after the transfer;[123]

(c) The transfer or obligation was disclosed or concealed;[124]

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;[125]

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;[126]

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred;

(k) The debtor transferred essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Several of these Fla. Stat. § 726.105 badges of fraud are present in this case and are, taken together, are sufficient for a finding of actual fraudulent intent.

### II–F–1–i. The Raymond James Transfer

With respect to the February 12, 2008 transfer of $88,825.00 from the Debtor to Mrs. Wortley's account at Raymond James & Associates, several badges of fraud exist which are sufficient for a finding of actual fraudulent intent.[127] First, the Raymond James Transfer was not an arm's length transaction. The Raymond James Transfer is a transfer to an insider as Barbara Wortley is the sole shareholder, president, officer, director, and registered agent for the Debtor.[128]

---

120. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Model Imperial, Inc.*, 250 B.R. 776, 790–91 (Bankr.S.D.Fla.2000); *In re American Way Service Corp.*, 229 B.R. 496, 525 (Bankr.S.D.Fla.1999); *In re Pembroke Development Corp.*, 124 B.R. 398, 400 (Bankr.S.D.Fla.1991).

121. *Welt v. Jacobson (In re Aqua Clear Technologies, Inc.)*, 361 B.R. 567, 579 (Bankr.S.D.Fla.2007).

122. *See, e.g., Fisher v. Grady*, 131 Fla. 1, 178 So. 852, 858 (1937); *Money v. Powell*, 139 So.2d 702, 703–04 (Fla.2d D.C.A.1962).

123. *See, e.g., Jones v. Wear*, 111 Fla. 69, 149 So. 345 (1933).

124. *See, e.g., Cleveland Trust Company v. Foster*, 93 So.2d 112 (Fla.1957).

125. *See, e.g., Gyorok v. Davis*, 183 So.2d 701, 703 (Fla.3d D.C.A.1966).

126. *See, e.g., Banner Constr. Corp. v. Arnold*, 128 So.2d 893, 896 (Fla. 1st D.C.A.1961).

127. *Id.* at 580; *United States v. Fernon*, 640 F.2d 609, 613 (5th Cir.1981).

128. *See* Pretrial Order, at ¶ 14 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]); *see also Kapila v. Plave (In re Paul)*, 217 B.R. at 338 (transfer in satisfaction of insider's obligation to third party a transfer to an insider); *Torcise v. Cunigan (In re Torcise)*, 146

Second, at the time of the Raymond James Transfer the Debtor was being actively pursued by the National Labor Relations Board to remedy certain labor practices and for back pay. In the month before the bankruptcy filing, the Debtor was engaged in settlement negotiations with the NLRB to resolve the July 2005 NLRB ruling and resulting $2 million exposure. These negotiations failed when the NLRB rejected the Debtor's offer of $200,000.00 and the Debtor rejected the NLRB's offer of $400,000.[129] The existence of the NLRB ruling before the time of the transfers to Barbara Wortley is a badge of fraud.

Third, at the time of the Raymond James Transfer, the Debtor was insolvent, the Debtor knew that the Debtor was insolvent, and despite her testimony that she did not believe the Debtor was insolvent, Mrs. Wortley knew or reasonably should have known that the Debtor was insolvent. The only way Mrs. Wortley could have lacked actual knowledge that the Debtor was insolvent would be through reckless disregard of her duties as titular head of the Debtor. But the evidence reflects that she was aware of the NLRB action since the Spring of 2004. All appeals of the NLRB decision were exhausted in October 2007, just months before the Raymond James Transfer. Moreover, Mrs. Wortley testified at trial that the Debtor had trouble making its rent payments even before the Raymond James Transfer.

Fourth, the Raymond James Transfer was concealed and not listed on the Debtor's Statement of Financial Affairs (Number 23) as a withdrawal from a partnership or distribution by a corporation.[130] The Raymond James Transfer was not initially recorded on the Debtor's General Ledger and was later reclassified as "rent and security deposit" on or after May 9, 2008 and back dated February 29, 2008 on the Debtor's General Ledger.[131] Mrs. Wortley's testimony gave no adequate explanation for why this payment was reclassified as rent just prior to filing bankruptcy.

Mrs. Wortley did not direct the $88,825.00 transfer to her Raymond James account, but believes that her husband did.[132] The transfer of the $88,825.00 was purportedly made because Mr. Wortley owed Mrs. Wortley money.[133] Mrs. Wortley previously testified that the Raymond James Transfer was for January Rent and the rent security deposit owed to Trafford Properties.[134] She also testified at trial that the $88,825.00 was for one month's rent, the security deposit, and back rent of approximately $9,000.00 (and that instead it being paid to the landlord entity and then her husband transferring it to her, it was transferred directly because he owed her money). But when I questioned Mrs. Wortley about this, she was not able to show how those amounts added up to $88,825.00.[135] Mrs. Wortley's explanations regarding the transfer are incompatible with the facts of this case and fail to show that the Debtor received reasonably equiv-

B.R. 303, 305 (Bankr.S.D.Fla.1992) (spouse an insider).

129. Pl.'s Ex. 32, at 89–96 (08–01793–JKO [DE 72]).

130. Pl.'s Ex. 1.

131. See Trial Tr. Vol. I, at 54–65 (08–01759–JKO [DE 187]); Pl.'s Ex. 11; Pl.'s Ex. 12.

132. Id. at 120–28.

133. Id. at 120–21, 127–28.

134. See Pl.'s Ex. 28, at 113 (08–01793–JKO [DE 51]).

135. See Trial Tr. Vol. I, at 122–25 (08–01759–JKO [DE 187]).

alent value for the Raymond James Transfer.

### II–F–1–ii. *"Management Fees"*

Barbara Wortley has stipulated that she received $130,000.00 from the Debtor between June 19, 2006 and June 6, 2008.[136] Mrs. Wortley did not have a formal management contract with the Debtor, the payments were not part of any well-established, ordinary, recurring business practice, and the varied widely in amount. At times, the Debtor would classify the management fee payments as "rent" and she would be paid twice in one month.

Like the Raymond James Transfer, most if not all of the badges of fraud exist, sufficient for a finding of actual fraudulent intent. First, the transfers classified as management fees were not arm's length transactions. The transfers were to Barbara Wortley, an insider. Second, at the time of the transfers the Debtor had been actively pursued by the National Labor Relations Board since at least July 2005 for back pay and to remedy certain labor practices. Third, the transfers were made by the Debtor to Mrs. Wortley at a time when the Debtor was insolvent as I explained above. Fourth, the transfers to Mrs. Wortley were concealed and not listed on the Debtor's Statement of Financial Affairs (Number 23) as a withdrawal from a partnership or distribution by a corporation.[137]

Finally, it is clear that Mrs. Wortley provided little or no consideration to the Debtor in exchange for these transfers. Although these transfers of funds were characterized as "management fees" on the Debtor's general ledger, she had little to no involvement in the business of the Debtor and had little to no knowledge of the operations of the Debtor as I explained above. Mrs. Wortley almost never visited the Debtor's facility. She only spoke with the managers of the Debtor occasionally and testified that her husband was the point of contact for managers of the Debtor. She testified at trial that she did not know the address of the Debtor's warehouse/fulfillment operations. When asked if she could name any of the employees whom she "liked" and did not want to replace with NLRB rehires, she was unable to name even one. Mrs. Wortley only reviewed the profit and loss statements of the Debtor once in a while and instead allowed her husband, a person with no formal position, to receive and review the profit and loss statements and take actions on behalf of the company. Barbara Wortley even allowed her husband to direct the wire transfer of funds from the Debtor. I accordingly find that the transfers by the Debtor to Barbara Wortley totaling $218,825.00 were made with the actual intent to hinder, delay, or defraud creditors pursuant to 11 U.S.C. § 548(a)(1)(A) and the Plaintiff is therefore entitled to avoid and recover said transfers from Mrs. Wortley under Count I.

### II–F–2. Avoidance and Recovery of Fraudulent Transfers to Liberty Properties Pursuant to 11 U.S.C. § 548(a)(1)(B)

Plaintiff Chapter 7 Trustee Soneet R. Kapila argues that Barbara Wortley failed to provide evidence that the Debtor received reasonably equivalent value in exchange for the $218,825.00 it paid in the two years leading up to the bankruptcy filing. For the reasons detailed above, I find that the transfers by the Debtor to Barbara Wortley totaling $218,825.00 were made with the actual intent to hinder, delay, or defraud creditors pursuant to 11 U.S.C. § 548(a)(1)(B) and the Plaintiff is therefore entitled to avoid and recover

---

**136.** *See* Pretrial Order, at ¶ 47 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**137.** Pl.'s Ex. 1.

those transfers from Mrs. Wortley under Count I.

### II–G. The Plaintiff's Claim for Avoidance and Recovery of Fraudulent Transfers Against Barbara Wortley Under Fla. Stat. § 726.105 (Adversary Proceeding 08–01793–JKO: Counts II & III)

Pursuant to 11 U.S.C. § 544(b)(1), the Trustee is authorized to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." As discussed above, by virtue of the NLRB judgments, the Plaintiff has satisfied his burden to establish that there exists at least one unsecured creditor who holds an allowed claim against the Debtor pursuant to 11 U.S.C. § 502.

Pursuant to Fla. Stat. § 726.105(1)(a), the Trustee may recover transfers made with the actual intent to hinder, delay and defraud creditors. As discussed in detail above, the applicable badges of fraud overwhelmingly indicate such intent when the Debtor made the transfers to Barbara Wortley. Transfers made for less than reasonably equivalent value that were made when the Debtor was insolvent are also avoidable under Fla. Stat. § 726.105(1)(b). As previously discussed, the Debtor was insolvent at the time it made the transfers to Barbara Wortley. Moreover, the Trustee proved that there were creditors during the time of the transfers. Consequently, the Plaintiff is entitled to judgment against Barbara Wortley in the amount of $218,825.00 under Counts II and III.

### II–H. The Plaintiff May Recover the Transfers Totaling $218,825 from Defendant Barbara Wortley Under 11 U.S.C. § 550.

The Trustee seeks to recover the $218,825.00 in transfers from Barbara Wortley pursuant to 11 U.S.C. § 550(a), which provides in pertinent part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made.

Further, once the Trustee has established that an identified transfer is avoidable, the Trustee may recover the entire fraudulent transfer under § 550(a).[138] The section is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.[139] As the Plaintiff has established that the transfers to Barbara Wortley are avoidable, the separate final judgment which I will enter in adversary proceeding 08–01793–JKO will provide that the Plaintiff may recover the avoided transfers totaling $218,825.00 from Barbara Wortley.

### II–I. The Plaintiff's Claims Against Barbara Wortley for Breach of Fiduciary Duty (Adversary Proceeding 08–01793–JKO: Counts VI & VII)

The Plaintiff seeks entry of a judgment against Mrs. Wortley for breach of fiducia-

---

**138.** *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931); *see also Myers v. Brook*, 708 So.2d 607 (Fla.2d D.C.A.1998).

**139.** *See Morris v. Kansas Drywall Supply Company, Inc. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D.Kan.1991); *Pritchard v. Brown (In re Brown)*, 118 B.R. 57, 60 (Bankr. N.D.Tex.1990); *Tidwell v. Chrysler Credit Corp. (Matter of Blackburn)*, 90 B.R. 569, 573 (Bankr.M.D.Ga.1987).

ry duty pursuant to Fla. Stat. §§ 607.0830(1), 607.0831(1)(a) and common law. He seeks damages in the amount of $2,305,275.86 for Mrs. Wortley's breach of fiduciary duty as she caused and worsened the Debtor's insolvency resulting in the bankruptcy filing as well as damages to the Debtor and creditors in excess that amount.

■■■ A fiduciary relationship exists when one party is under a duty to act for or give advice for the benefit of another.[140] Whenever a confidential or fiduciary relationship is established, the burden falls upon the trusted party to show that his conduct was proper.[141] As the sole shareholder, president, officer, director, and registered agent of the Debtor, Mrs. Wortley had a fiduciary relationship with the Debtor.

■■■ Under applicable Florida corporate law, a director must perform his or her corporate duties (1) in good faith; (2) with such care as an ordinary prudent person in a like position would exercise under similar circumstances; and (3) in a manner the director reasonably believes to be in the best interests of the corporation.[142] Under Florida law, corporate officers and directors owe duties of loyalty and a duty of care to the corporation.[143] The fiduciary duties of officers and di-

rectors are extended to the creditors of a corporation when the corporation becomes insolvent or is in the "vicinity of insolvency."[144] To permit corporate officers and director "to use their fiduciary positions to obtain preferential treatment at the expense of third-party creditors is manifestly unfair."[145] As a result, "[a] corporate officer or director breaches the duty of loyalty if that person 'depart[s] from his corporate responsibility and start[s] serving himself.'"[146] A fiduciary who commits a breach of her duty as a fiduciary is guilty of tortious conduct, and the wronged party is entitled to tort damages for harm caused by the breach of duty.[147]

■■■ Mrs. Wortley, as the sole shareholder, president, officer, director, and registered agent of the Debtor, owed the Debtor a fiduciary duty to act in good faith and in the best interest of the corporation. Because the Debtor was insolvent or, at the very least, in the "vicinity of insolvency," Mrs. Wortley owed a fiduciary duty to the Debtor's creditors and was required to exercise due care in the supervision and management of the company and the performance of her duties for the benefit of its creditors.[148] Mrs. Wortley was derelict in those duties. I find that Mrs. Wortley breached her fiduciary duty

---

140. *See Restatement (Second) of Torts*, § 874, cmt. a (1979); *Restatement (Second) of Trusts*, § 2, cmt. b (1959).

141. *Id.*

142. Fla. Stat. § 607.0830(1).

143. *See Cohen v. Hattaway*, 595 So.2d 105 (Fla. 5th D.C.A.1992); *B & J Holding Corp. v. Weiss*, 353 So.2d 141 (Fla.3d D.C.A.1978).

144. *Aqua Clear*, 361 B.R. at 575 (citing *Official Committee of Unsecured Creditors of Toy King Distributors, Inc. v. Liberty Savings Bank (In re Toy King Distributors, Inc.)*, 256 B.R. 1, 167 (Bankr.M.D.Fla.2000)).

145. *Poe & Associates, Inc. v. Emberton*, 438 So.2d 1082, 1084–1085 (Fla. 2nd D.C.A. 1983); *Beemer v. Crandon Enter., Inc.*, 53 B.R. 412 (Bankr.M.D.Fla.1985).

146. *Aqua Clear*, 361 B.R. at 575 (quoting *Intercarga Internacional de Carga, S.A. v. Harper Group, Inc.*, 659 So.2d 1208, 1210 (Fla. 3rd D.C.A.1995)).

147. *Id.*

148. Fla. Stat. § 607.0830(1); *see also Aqua Clear*, 361 B.R. at 575.

to the Debtor and to creditors. Even assuming *arguendo* that the Debtor were solvent during all relevant periods, I would still find that Mrs. Wortley breached her fiduciary duties.

As in the *Aqua Clear* case, Mrs. Wortley failed to take any steps to properly discharge her fiduciary duties and instead, granted her husband (who held no position with the Debtor) unsupervised and unrestrained authority over the Debtor. Like the defendant wife in the *Aqua Clear* case, Mrs. Wortley signed the petition which commenced this bankruptcy case under penalty of perjury, and did so without investigation. Similarly, it is apparent that Mrs. Wortley performed little to no services for the Debtor yet received checks totaling $218,825.00 in the two years preceding the bankruptcy filing. It is clear from Mrs. Wortley's testimony that she did very little, if anything, in return for her receipt of management fees from the Debtor. Mrs. Wortley previously testified that her husband, Joseph Wortley, was her advisor and acted as her eyes, ears, and mouth.[149]

The above sections detail the complete deficit of activity on Mrs. Wortley's part to fulfill her role as the Debtor's sole shareholder, president, officer, director, and registered agent—all while receiving $218,825.00 within two years before the bankruptcy filing and, of that amount, $88,825.00 within four months of the filing. These funds were later reclassified as rent and security deposit on the Debtor's General Ledger, allegedly on February 29, 2008. But the reclassification did not actually occur until after May 9, 2008 (along with accruals for increased rent and a rent security based on the backdated written lease ostensibly effective January 2008—and reclassifications of intercompany debt).

The transfer of $88,825.00 was for no consideration and the Defendant has failed to provide an adequate explanation for why this payment was reclassified as rent just prior to filing bankruptcy. Mrs. Wortley and her husband testified that Mrs. Wortley was paid by the Debtor for money Mr. Wortley owed her personally. As detailed in the preceding sections, the explanation (that the transfer of $88,825.00 was made by the Debtor directly to the Defendant because her husband owed her money and they wanted to save a $15.00 wire charge), simply does not add up and Mrs. Wortley has failed to show that the Debtor received reasonably equivalent value for the Raymond James Transfer.

At the time of the $88,825.00 transfer, Barbara Wortley knew or should have known that the Debtor was insolvent. She testified that the Debtor had trouble making its rent payments and "always had to catch up on rent" even before the rent was increased. Mrs. Wortley had also been aware of the NLRB action since in the Spring of 2004 and all of the appeals of the NLRB decision were exhausted just months before the $88,825.00 transfer in October 2007. Moreover, the $88,825.00 transfer was concealed and not listed on the Debtor's Statement of Financial Affairs (Number 23) as a withdrawal from a partnership or distribution by a corporation.

In addition to the transfers to herself, Mrs. Wortley further breached her fiduciary duties by failing to safeguard assets of the Debtor and by engineering-or passively allowing-the fraudulent transfer of hundreds of thousands of dollars of the Debtor's funds to other insiders, including Defendants Liberty Properties, Liberty Associates and Advanced Vehicle Systems.

149. Pl.'s Ex. 28, at 43 (08–01793 [DE 51] ).

In fact, the timing of the transfers from the Debtor to Mrs. Wortley and other insiders lead me to conclude that the Wortleys executed a calculated plan to bleed the Debtor dry and siphon off it assets prior to filing bankruptcy.

After the Third Circuit affirmed the decision of the NLRB in February 2007, Defendant Liberty Associates (owned by Mrs. Wortley's husband, Joseph Wortley), received $50,000.00 from the debtor on or about October 27, 2007. Mrs. Wortley previously testified that she did not have any involvement in the $50,000.00 transfer to Liberty Associates and it was probably her husband's decision to make the transfer, but she doesn't know.[150] She further testified that she did not think the $50,000.00 was owed to Liberty Associates but thought that it was transferred to Liberty Associates as rent was owed to Liberty Properties and was it was wired directly to Liberty Associates to save the wire fees.[151] Advanced Vehicle Systems, LLC, a company owned by Mrs. Wortley and which was the manufacturer of vehicles for surveillance sold to the government, received $15,000.00 on April 13, 2007. The only relationship between Advanced Vehicle and the Debtor appears to be their ownership by Mrs. Wortley.

After the Third Circuit affirmed the decision of the NLRB and despite the Debtor's trouble making the current rent payments of $14,500.00, Mrs. Wortley executed a lease on behalf of the Debtor, allegedly dated January 1, 2008 (just five months before the bankruptcy filing) which purported to more than triple the Debtor's warehouse facility rent to $46,666.67 per month. Although the

Lease indicates an effective date of January 1, 2008, the rent increase was not implemented until at least March 2008. For the reasons articulated above, I conclude that the lease was executed no earlier than May 2008 and backdated as justification to further bleed the bankruptcy estate in anticipation of filing.

The Debtor paid a bankruptcy retainer to Furr & Cohen on May 8, 2008.[152] Mrs. Wortley previously testified that in May 2008, "I was considering my options. I wanted to know what my options were." [153] Thereafter, during the three weeks leading up to the bankruptcy filing, Mr. Wortley's company Liberty Properties received $96,500.00 from the Debtor, allegedly past due rent under the triple rent lease which Mr. and Mrs. Wortley backdated to January 2008. Mrs. Wortley testified that she did not know who the people were who directed the wire transfers which further drained the Debtor on June 9, 2008.

Liberty Properties also received a reduction in the debt it owed the Debtor in the amount of $46,666.67, ostensibly a security deposit pursuant to the back-dated triple rent lease. In the Debtor's General Ledger and Schedule B–3. By another entry dated January 1, 2008, in the same journal entry, the Debtor created a security deposit due from Liberty Properties for $46,666.67. The Debtor further reduced the amount of debt due from Liberty Properties to the Debtor for two additional months of rent increase totaling $64,333.34 on April 1, 2008 ($32,166.67) and May 1, 2008 ($32,166.67). Moreover, according to the General Ledger, the several amounts owed by insiders were reclassified such that all intercompany amounts were due

**150.** Pl.'s Ex. 30, at 55–56 (08–01793–JKO [DE 70]).

**151.** Pl.'s Ex. 28, at 119 (08–01793–JKO [DE 51]).

**152.** Pl.'s Ex. 30, at 14 (08–01793–JKO [DE 70]).

**153.** *Id.* at 17.

from Liberty Properties on January 1, 2008. As detailed above, none of these transfers or reclassifications in fact occurred until after May 9, 2008.

■■■ The court in *Toy King Distributors* held that "[a]n officer or director may be held 'strictly accountable and liable if the corporate funds or property are wasted or mismanaged due to their inattention to the duties of their trust.' " [154] Here, Barbara Wortley allowed the Debtor's corporate funds and assets in the amount of $480,325.02 to be wasted and/or mismanaged by the transfers of those funds and assets to herself and insider entities Liberty Properties, Advanced Vehicle Systems and Liberty Associates within the two years preceding the bankruptcy petition date. Mrs. Wortley is liable for the damages incurred by her breach of trust.[155] But for her conduct, the $2.17 million judgment in favor of the NLRB could have been avoided, reduced, or otherwise worked out such that the Debtor could remain in business. Any reasonable business person properly exercising her corporate responsibilities would have carefully considered the obvious negative consequences of the payments to insiders and incurring additional debt by signing a new lease which more than tripled the Debtor's rent.[156]

Mrs. Wortley breached her fiduciary duty through her actions and inactions. Her behavior cannot be excused as mere inadvertence or inattention, but rather gross negligence at best and, on balance, more fairly characterized as willful fraud. Mrs. Wortley failed to participate in what a reasonable person in her position would consider to be very important matters of the company. Her actions were not in the best interests of the Debtor or its creditors. The evidence presented at trial was that Mrs. Wortley's breaches of her fiduciary duties have harmed the bankruptcy estate in the amount exceeding $2,305,275.86, and the separate final judgment which I will enter in adversary proceeding 08–01793–JKO will accordingly find Defendant Barbara Wortley liable to Chapter 7 Trustee Soneet Kapila for that amount. Because counts IV and V were pled in the alternative, I need not reach them.

### III. LIBERTY PROPERTIES AT TRAFFORD, LLC, LIBERTY ASSOCIATES, LC, AND ADVANCED VEHICLE SYSTEMS, LLC

Adversary proceeding 08–01792–JKO is a lawsuit seeking to recover preferential and fraudulent transfers from insider entities of the Debtor. Specifically, the Plain-

---

**154.** *Toy King Distributors,* 256 B.R. at 168.

**155.** *F & C Services, Inc. v. Nielson (In re F & C Services, Inc.),* 44 B.R. 863 (Bankr.S.D.Fla. 1984) (Where director of company breached his fiduciary duties by failing to safeguard assets of the debtor and by engineering fraudulent transfer, he was liable for the difference in amount of consideration arguably paid by transferee from true value of assets transferred.).

**156.** Deepening insolvency is a valid theory of damages for breach of fiduciary duty. *See Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.),* 353 B.R. 324, 338 (Bankr.D.C.2006) ("Rather than attempt to

'discover' a separate common law tort which must then be neutered, this court prefers to treat deepening insolvency as the theory of harm that it was always meant to be, and will rely on other, more established (not to mention less convoluted) common law causes of action to ascertain whether the defendants in this case have engaged in a legal wrong for which Alberts is entitled to recover. Unless and until this court is told differently by a higher court in its own circuit, deepening insolvency will remain a viable theory of damages in this jurisdiction regardless of whether the injury occurred as a result of negligence or fraud.").

tiff Chapter 7 Trustee seeks to avoid and recover $50,000.00 which was paid to Defendant Liberty Associates, LC, $15,000 which was paid to Defendant Advanced Vehicle Systems, LLC, and $96,500.01 which was paid to Defendant Liberty Properties at Trafford, LLC. The Plaintiff also seeks turnover of a $39,554.37 receivable and $46,666.67 security deposit from Liberty Properties.

As detailed above, Liberty Properties at Trafford, LLC was the Debtor's warehouse landlord and is owned by the husband of the Debtor's principal.[157] Prior to January 2008, the Debtor did not have a written lease agreement with Liberty Properties.[158] Sherry Bennett, one of the Chapter 7 Trustee's accountants, testified that rent was being paid in full by the Debtor to Liberty Properties.[159] The Debtor's General Ledger reflects that the Debtor was paying rent totaling $14,500.00 per month for every month from June 2006 through May 2008.[160] Although the rent being paid by the Debtor was allegedly below fair market value, Mrs. Wortley testified that the Debtor had trouble making the payments.[161]

After the Third Circuit affirmed the decision of the NLRB and despite the Debtor's trouble making the $14,500.00 rent payments, the Debtor and Liberty Properties entered into a written lease allegedly dated January 1, 2008 which tripled rent to

$46,666.67 per month.[162] Although the written lease indicates an effective date of January 1, 2008, the rent increase was not implemented at that time. Bill Gates provided a document titled "Trafford Distribution Center Summary Financial Statements (With Pro Forma Adjustments) 2005–2007" to the NLRB at a meeting on or about March 25, 2008.[163] Page two of the document indicates current rent of $1.09 per square foot totaling $174,000 annually,[164] clearly indicating that rent as of the March meeting was $14,500.00 per month. Although the Wortleys claim that the written lease was effective January 1, 2008, the Debtor continued to pay $14,500.00 per month on January 11, 2008; February 6, 2008, March 11, 2008; April 9, 2008, and May 9, 2008.[165] Mrs. Wortley was unable to provide a satisfactory explanation for why $14,500.00 was paid for those months when there was allegedly a new lease executed in January under which the Debtor was required to pay $46,666.67.[166] I therefore find that the triple rent lease was not in existence before March 25, 2008 despite the Wortleys' claimed January execution date.

In the month leading up to the Debtor's June 13, 2008 bankruptcy filing, the Debtor transferred $96,500.01 to Liberty Properties for the alleged rent increases in January, February, and March of 2008.[167]

---

**157.** Pretrial Order, at ¶¶ 8–9 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**158.** *Id.* at ¶ 34.

**159.** Trial Tr. Vol. I, at 57 (08–01759–JKO [DE 187]).

**160.** *See* Pl.'s Ex. 11, at 8–20, 22–26, 28–30, 32 (also at 08–01793–JKO [DE 51–4]).

**161.** Trial Tr. Vol. I, at 131 (08–01759–JKO [DE 187]).

**162.** *Id.* at 116–17.

**163.** Pl.'s Ex. 32, at 34–36 (08–01793–JKO [DE 72]).

**164.** *Id.* at 110–11.

**165.** *See* Pl.'s Ex. 11, at 28–30, 32 (08–01793–JKO [DE 51–4]).

**166.** *See* Trial Tr. Vol. I, at 117–188 (08–01759–JKO [DE 187]).

**167.** Pretrial Order, at ¶ 36 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

Looking back approximately three months prior to filing, the Debtor transferred additional funds (in the form of ledger entry debt reductions) to Liberty Properties totaling $64,333.34.[168] Looking back six months, the Debtor similarly transferred $46,666.67 to Liberty Properties.[169] Although the Debtor's General Ledger indicated that the above referenced transfers occurred on dates ranging from January 1, 2008 through May 1, 2008, the Plaintiff proved at trial that all of the transfers actually occurred after May 9, 2008, within thirty-five days before the bankruptcy filing.[170] The evidence presented at trial, particularly the testimony of Sherry Bennett, demonstrated that the ostensible transaction dates did not match the sequential ledger transaction entries, and it was possible to determine that ordinary course ledger entry patterns suddenly shifted in early May with earlier-dated transactions receiving subsequently numbered ledger transactions IDs. I therefore conclude that these transfers were back-dated within the Debtor's General Ledger sometime after May 9, 2008.

As detailed above, Defendant Liberty Associates, LC is controlled by the husband of the Debtor's principal.[171] The parties agree that the Debtor transferred $50,000.00 to Liberty Associates on October 17, 2007.[172] Liberty Associates claims that the $50,000.00 was on account of rent owed to Liberty Properties at Trafford,

LLC.[173] The undisputed record evidence, however, is that there was no $50,000.00 rent shortfall reflected in the Debtor's General Ledger as of October 2007.[174]

The Defendants questioned the Trustee's accountant, Mrs. Bennett, about the Defendants' Exhibit "DD," which was ostensibly a schedule of rents due from 2003 through 2008.[175] Mrs. Bennett testified that it was not a record of the Debtor and it was not prepared by Kapila & Company.[176] She further testified about the inaccuracies set forth in the exhibit.[177] The Defendants did not seek to introduce it into evidence, and the undisputed record evidence before me is that the Debtor was current in its rent obligations to Liberty Properties at the time of the $50,000.00 transfer to Liberty Associates. I will therefore decline to amend the summary judgment order at Docket Entry 193 in adversary proceeding 08–01792–JKO, and will deny the motion for reconsideration at Docket Entry 208 by separate order. But even if Exhibit DD were properly before me, it was thoroughly discredited by Mrs. Bennett's testimony. The numerous discrepancies in the document were troubling. I am unable to conclude that Exhibit DD has any probative weight because, in the context of this case as a whole, I am simply not surprised that a document would conveniently appear purporting to support the Wortleys' less-than-credible version of events. Exhibit DD is a false

168. *See* Trial Tr. Vol. I, at 48–49, 57–58 (08–01759–JKO [DE 187]); Pl.'s Ex. 11; Pl.'s Ex. 12; Pl.'s Ex. 13.

169. *See* Pl.'s Ex. 11; Pl.'s Ex. 12; Pl.'s Ex. 13.

170. *See* Trial Tr. Vol. I, at 49–58 (08–01759–JKO [DE 187]); Pl.'s Ex. 12.

171. Pretrial Order, at ¶ 10 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

172. *Id.* at ¶ 37.

173. *See* Trial Tr. Vol. I, at 105 (08–01759–JKO [DE 187]).

174. *See* Pl.'s Ex. 11, at 8–20, 22–26, 28–30, 32–33 (08–01793–JKO [DE 51–4]).

175. *See* Trial Tr. Vol. II, at 504 (08–01759–JKO [DE 186], at 225).

176. *Id.* at 505.

177. *Id.* at 506–512.

document prepared as part of a scheme to defraud this Court. I therefore find that Liberty Associates provided no direct benefit to the Debtor in exchange for the $50,000.00 it received.

As detailed above, Advanced Vehicle Systems, LLC's managing member is Mrs. Wortley, the Debtor's principal.[178] Advanced Vehicle Systems is an insider of the Debtor pursuant to 11 U.S.C. § 101(31)(A)(1) and Florida Statutes § 726, et seq.[179] On April 13, 2007, the Debtor transferred $15,000 to Advanced Vehicle Systems.[180] Advanced Vehicle Systems argues (identically to Liberty Associates) that this was on account of rent owed to Liberty Properties and the Debtor thus received reasonably equivalent value. As I explained above, the evidence before me is that there was no shortfall in rent and the Debtor was current in its rent obligations to Liberty Properties at the time of the $15,000.00 transfer to Liberty Associates. I therefore find that Advanced Vehicle Systems provided no direct benefit to the Debtor in exchange for the $15,000.00 it received.

### III–A. Avoidance and Recovery of Preferential Transfers Against Liberty Properties at Trafford, LLC Pursuant to 11 U.S.C. § 547 (Adversary Proceeding 08–01792–JKO: Count VIII)

 Defendant Liberty Properties at Trafford, LLC does not dispute that it is an affiliate of the Debtor and that the transfers totaling $207,500.02 were made within seven months before the bankruptcy petition date.[181] It also does not dispute that these transfers enabled it to receive more than it would have been otherwise entitled to in a Chapter 7 liquidation. I therefore need only decide whether the Debtor was insolvent at the time of the transfers, and whether any § 547(c) defenses apply. As detailed above, the Debtor was insolvent for preferential and fraudulent transfer purposes at least as early as the original July 2005 NLRB ruling.

 As for § 547(c) defenses, the best case scenario for the Defendants would be for me to accept the back-dated "January 2008" triple rent lease at face value, but even that renders all of the relevant transfers on account of antecedent debt such that there is no § 547(c)(1) contemporaneous exchange for new value. For the ordinary course defense of § 547(c)(2) to be applicable, the transfer itself must have either been in the ordinary course of business or financial affairs of the debtor and the transferee (a subjective test) or it must have been made according to ordinary business terms (an objective test). Under the objective test, it is the defendant's burden to offer evidence that the payment was within the ordinary course of business in the relevant industry.[182] Ordinary business terms should broadly encompass practices of firms that are similar in some fashion to

---

178. Pretrial Order, at ¶¶ 12–13 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

179. *See id.* at ¶ 13.

180. *Id.* at ¶ 38.

181. 11 U.S.C. § 547(b); *see also In re Long-view Aluminum, LLC*, No. 10–254, Docket Entry 20, 431 B.R. 193, 2010 WL 2635787 (N.D. Ill. June 28, 2010) (Der–Yeghiayan, J.) (holding that LLC membership is equivalent to corporate directorship such that, even absent a showing of control, preference period should be extended from 90 days to 1 year).

182. *See Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.),* 296 F.3d 363 (5th Cir.2002).

the creditor.[183] Dealings should be considered extraordinary and outside the range of § 547(c)(2) only if they are so idiosyncratic that they fall outside that broad range.[184] After the Third Circuit affirmed the NLRB's decision and the Supreme Court denied certiorari, and notwithstanding that the Debtor "always had to catch up on rent," [185] the principal of the Debtor claims to have entered into a lease agreement ostensibly dated January 1, 2008 which increased the Debtor's rent from $14,500 per month to $46,666.66 per month. Nevertheless, the Debtor continued paying rent at the $14,500 rate until the month preceding the bankruptcy filing, when it suddenly transferred "back rent" to its affiliate, Defendant Liberty Properties at Trafford, LLC. The months leading up to the bankruptcy filing consisted of wire transfers and debt reductions in favor of Liberty Properties totaling $207,500.02 and I find on the undisputed record evidence that all of these transfers were extraordinary under either industry practice or the historical practice of these parties. Section 547(c)(2) therefore does not apply.

■ Sections 547(c)(3), (c)(5), (c)(6), (c)(7), (c)(8), and (c)(9) are all facially inapplicable, so the only remaining 547(c) defense is the "new value" defense under (c)(4). Liberty Properties has tried to argue that the Debtor received value because it had been paying below market rent, but § 547(c)(4) provides that the creditor must have given new value *after* the transfer. These transfers took place in the run-up to the Debtor's bankruptcy filing, and they were at best payments on account of antecedent debt because, as discussed above, the undisputed record evidence is that these transfers satisfied back rent and a security deposit. Therefore, § 547(c)(4) is also inapplicable. The transfers to Defendant Liberty Properties at Trafford, LLC totaling $207,500.02 were therefore clearly preferential under § 547.

**III–B. Avoidance and Recovery of Fraudulent Transfers from Liberty Properties, Liberty Associates, and Advanced Vehicle Systems**

■ The Plaintiff has sought to avoid and recover fraudulent transfers to Liberty Properties, Liberty Associates, LC and Advanced Vehicle Systems, LLC pursuant to 11 U.S.C. § 548. Section 548 provides that a trustee may avoid any transfer of property made within two years before the petition date if there was: (A) actual intent to hinder, delay, or defraud creditors; or (B) a constructive fraudulent transfer. Constructive fraudulent transfers of property interests occur when the debtor received less than reasonably equivalent value in exchange and the debtor: (I) was insolvent on the date of the transfer; (II) was left with unreasonably small capital for then-existing or anticipated business activities; (III) intended to incur or believed it was incurring debts beyond its ability to timely repay; or (IV) made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course.[186]

As discussed above, the Debtor was insolvent on June 14, 2006 and at all times through June 13, 2008. Because the transfers to Liberty Properties, Liberty Associates, LC and Advanced Vehicle Systems, LLC took place after June 14, 2006 while the Debtor was insolvent, I need only ad-

**183.** *In re First Jersey Securities, Inc.,* 180 F.3d 504 (3d Cir.1999); *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029 (7th Cir.1993).

**184.** *See id.*

**185.** Pl.'s Ex. 28, at 68.

**186.** *See* 11 U.S.C. § 548(a)(1).

dress whether the transfers were made with the intent to hinder, delay or defraud creditors and whether the Debtor received less than reasonably equivalent value for those transfers.

*III–B–1. Avoidance and Recovery of Fraudulent Transfers Against Liberty Properties at Trafford, LLC for $207,500.02 Pursuant to 11 U.S.C. § 548 (Adversary Proceeding 08–01792–JKO: Count III)*

*III–B–1–i. Avoidance and Recovery of Fraudulent Transfers to Liberty Properties Pursuant to 11 U.S.C. § 548(a)(1)(A)*

The Trustee has met his burden of proof that the transfers to Liberty Properties were fraudulent by a preponderance of the evidence.[187] As detailed above, several badges of fraud exist sufficient for a finding of actual fraudulent intent. The transfers to Liberty Properties were transfers "to an insider" as Liberty Properties is the landlord of the Debtor, which is owned by the husband of the Debtor's principal. The transfers to Liberty Properties were concealed as they were not listed on the Debtor's Statement of Financial Affairs. At the time of the transfers, the Debtor was being actively pursued by the National Labor Relations Board, and the existence of the $2 million exposure gives motive for the questionable behavior. The Debtor did not receive consideration in return for the transfers. The only documents provided at trial by Defendants to attempt to establish value were Defendants Exhibits "CCC" and "DDD" which I find do not establish that the Debtor received reasonably equivalent value for the payment of rent in excess of $14,500.00 per month as of January 1, 2008. The evidence present-ed at trial indicates that the new lease was not entered into until after March 2008 and the payments of additional rent under the new lease were made in arrears after May 9, 2008 which was the day after the Debtor met with bankruptcy counsel. Moreover, the circumstances of this case suggest that the entry into the new lease at triple the rent the Debtor was paying was done by insiders to strip the debtor of what little value it had, and I so find. The evidence presented by the Plaintiff at trial that the transfers to Liberty Properties totaling $207,500.02 were backdated along with other ledger entries by the Debtor is ample evidence of fraudulent intent.

The Debtor was insolvent at the time of the transfers to Liberty Properties as more fully discussed above. The transfers to Liberty Properties were part of a scheme to exhaust all of the Debtor's assets to hinder, delay and defraud creditors, including the NLRB whose action ultimately resulted in a judgment of more than $2 million. I therefore find that the transfers totaling $207,500.02 were made with the actual intent to hinder, delay, or defraud creditors, including the NLRB and the Plaintiff is entitled to avoid and recover said transfers.

*III–B–1–ii. Avoidance and Recovery of Fraudulent Transfers to Liberty Properties Pursuant to 11 U.S.C. § 548(a)(1)(B)*

The Plaintiff argues that Liberty Properties has failed to provide evidence that the Debtor received reasonably equivalent value in exchange for the $207,500.02 it paid in the months leading up to the bankruptcy filing. Liberty Properties did not provide sufficient evidence at trial to es-

187. *See Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Model Imperial, Inc.,* 250 B.R. 776, 790–91 (Bankr.S.D.Fla.2000); *In re American Way Service Corp.,* 229 B.R. 496, 525 (Bankr. S.D.Fla.1999); *In re Pembroke Development Corp.,* 124 B.R. 398, 400 (Bankr.S.D.Fla. 1991).

tablish that the fair market value of the rent at the facility was more than the $14,500.00 that the Debtor was already paying prior to the new lease as discussed above in the Court's analysis under § 548(a)(1)(A).

As a result, the Plaintiff is entitled to avoid and recover the transfers to Liberty Properties totaling $207,500.02 from Liberty Properties.

### III–B–2. Avoidance and Recovery of Fraudulent Transfers Against Liberty Associates, LC for $50,000.00 Pursuant to 11 U.S.C. § 548 (Adversary Proceeding 08–01792: Count X)

The parties agree that the Debtor transferred $50,000.00 to Liberty Associates on October 17, 2007.[188] As discussed in detail above, the Debtor was insolvent at the time of the transfer to Liberty Associates. Liberty Associates claims that the $50,000 paid to it by the Debtor on October 17, 2007 was actually on account of rent owed to Liberty Properties at Trafford, LLC.[189] It is therefore undisputed that Liberty Associates provided no direct benefit to the Debtor in exchange for the $50,000.00 it received. But as I explained in detail above, there was no $50,000.00 rent shortfall reflected in the Debtor's General Ledger as of October 2007. The evidence before me is that the Debtor was current in its rent obligations to Liberty Properties at the time of the $50,000 transfer to Liberty Associates. The burden then falls to Liberty Associates to show that the Debtor received indirect benefits constituting reasonably equivalent value. It did not meet that burden. I therefore find that the Debtor did not receive, either directly or indirectly, reasonably equiva-

lent value in exchange for the $50,000 transfer to Liberty Associates. Separate final judgment will therefore be entered in favor of the Plaintiff Chapter 7 Trustee on Count X of the Amended Complaint in adversary proceeding 08–01792–JKO because the transfers in favor of Defendant Liberty Associates were fraudulent transfers under 11 U.S.C. § 548.

### III–B–3. Avoidance and Recovery of Fraudulent Transfers Against Liberty Associates, LC for $15, 000.00 Pursuant to 11 U.S.C. § 548 (Adversary Proceeding 08–01792–JKO: Count XVI)

The $15,000.00 transfer to Advanced Vehicle Systems took place on April 13, 2007.[190] As discussed in detail above, the Debtor was insolvent at the time of the transfer to Advanced Vehicle Systems.

Advanced Vehicle Systems argues, identically to Liberty Associates, that the $15,000 transfer was on account of rent owed to Liberty Properties and the Debtor thus received reasonably equivalent value. However, also like Liberty Associates, this argument fails because the Debtor's General Ledger reflects no rent shortfall of $15,000.00 as of April 2007.[191] The evidence before me is that the Debtor was current in its rent obligations to Liberty Properties at the time of the $15,000.00 transfer to Advanced Vehicle Systems. I therefore find that the Debtor did not receive, either directly or indirectly, reasonably equivalent value in exchange for the $15,000.00 transfer to Advanced Vehicle Systems. Separate final judgment will therefore be entered in favor of the Plaintiff Chapter 7 Trustee on Count XVI of the

---

**188.** Pretrial Order, at ¶ 37 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**189.** *See* Trial Tr. Vol. I, at 105 (08–01759–JKO [DE 187]).

**190.** Pretrial Order, at ¶ 38 (08–01792–JKO [DE 194]; 08–01793–JKO [DE 179]).

**191.** Pl.'s Ex. 11, at 8–20, 22–26, 28–30, 32–33.

Amended Complaint in adversary 08–01792–JKO because the transfers in favor of Defendant Advanced Vehicle Systems were fraudulent transfers under § 548.

### III–B–4. Avoidance and Recovery of Fraudulent Transfers Against Liberty Properties Under Florida Statutes (Adversary Proceeding 08–01792–JKO: Counts IV–VII)

Pursuant to § 544(b)(1), the Trustee is authorized to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." As discussed above, by virtue of the NLRB judgments, the Plaintiff has satisfied his burden to establish that there exists at least one unsecured creditor who holds an allowed claim against the Debtor pursuant to § 502.

Pursuant to Fla. Stat. § 726.105(1)(a), the Trustee may recover transfers made with the actual intent to hinder, delay and defraud creditors. As discussed in detail above, the applicable badges of fraud overwhelmingly indicate such intent when the Debtor made the transfers of $207,500.02 to Liberty Properties. Transfers made for less than reasonably equivalent value that were made when the Debtor was insolvent are also avoidable under Florida law pursuant to Fla. Stat. § 726.105(1)(b). As previously discussed, the Debtor was insolvent at the time it made transfers totaling $207,500.02 to Liberty Properties. Moreover, the Trustee proved that there were creditors during the time of the transfers. Consequently, the Plaintiff is entitled to judgment against Liberty Properties in the amount of $207,500.02 under Counts IV and V.

### III–B–5. Turnover of $39,554.37 From Liberty Properties (Adversary Proceeding 08–01792–JKO: Count II)

Count II of the Plaintiff's Complaint in 08–01792–JKO seeks turnover from Liberty Properties of a receivable of the estate in the amount of $39,554.37 pursuant to 11 U.S.C. § 542. According to the Debtor's General Ledger, $39,554.37 is due from Liberty Properties for the Security Deposit.[192] Section 542(b) provides:

> Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debtor to, or on the order of, the trustee, except to the extent that such debtor may be offset under section 553 of this title against a claim against the debtor.

As such, Liberty Properties is liable to the Trustee for the return of said funds. As a result of the foregoing, a separate final judgment will be entered in adversary proceeding 08–01792–JKO in favor of the Plaintiff and against against Liberty Properties on count II directing turnover in the amount of $39,554.37.

### III–B–6. Recovery from the Defendants Under 11 U.S.C. § 550 (Adversary Proceeding 08–01792–JKO: Counts IX, XV, XX)

As has so far been discussed *ad nauseam*, the Plaintiff seeks to recover the transfers of $207,500.02 from Liberty Properties, $50,000.00 from Liberty Associates, and $15,000.00 from Advanced Vehicle pursuant to 11 U.S.C. § 550(a). Section 550(a) provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the

---

**192.** Pl.'s Ex. 11; Pl.'s Ex. 13.

trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made.

Further, once the Trustee has established that an identified transfer is avoidable, the Trustee may recover the entire fraudulent transfer under § 550(a).[193] As the Plaintiff has established that the transfers to Liberty Properties, Liberty Associates and Advanced Vehicle are avoidable, separate final judgment in 08–01792–JKO will permit the Plaintiff to recover the avoided transfers of $207,500.02 from Liberty Properties, $50,000.00 from Liberty Associates, and $15,000.00 from Advanced Vehicle Systems. Counts I, VI, VII, XI, XII, XIII, XIV, XVII, and XIX in 08–01792–JKO were pled in the alternative, and I need not reach those counts because I have already found that the Plaintiff is entitled to judgment in the amounts sought under the legal theories articulated above.

## IV. RICHARD I. CLARK

In adversary proceeding 08–01759–JKO, I only heard evidence on the narrow issue of whether the Defendant Richard I. Clark, in any of his multiple capacities, owned the Heinz Receivable. The parties agree that Mr. Clark filed a UCC Financing Statement, File Number 200851205813, under the name XCo. Finance in Pennsylvania on May 9, 2008 (about a month before this bankruptcy filing) and no financing statement was ever filed in Florida.

The Debtor lists a debt owed by H.J. Heinz Company ("Heinz") in the amount of $231,062.42 (the "Heinz Receivable") on Schedule B of its schedules.[194] Schedule D lists a lien with XCo. Finance c/o Laddey Clark and Ryan in the amount of $293,444.26.[195] On June 10, 2009, Mr. Clark filed Proof of Claim No. 9 on behalf of the Joseph M. Wortley Trust. In that Proof of Claim, the Joseph M. Wortley Trust asserts that it owns the subject accounts receivable (including the Heinz Receivable).

At trial, the Defendant entered transaction receipts into evidence reflecting that funds totaling $201,750.00 were transferred to the Debtor between October 3, 2003 and January 30, 2004.[196] See Defendants' Exhibits "XXXX" and "YYYY". While Mr. Clark was on the witness stand, I posed questions regarding the factoring agreement which supports his position that he purchased receivables of the Debtor:

THE COURT: The Joseph M. Wortley Trust was buying specific accounts receivable, Mr. Clark?

THE WITNESS: Your Honor, I believe that it was buying all the receivables, or selected receivables. Although I had a list of them at the time, it never got followed up with paper work, which I think the Court will see.

THE COURT: Well, I want to know, in respect of the wire transfer made on 10–3–03 that you've spoken about in the amount of $18,250.00, what receivable was purchased?

THE WITNESS There was not one designated. I though it would be all of the available receivables.

193. *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931); *see also Myers v. Brook,* 708 So.2d 607 (Fla.2d D.C.A.1998).

194. Pl.'s Ex. 1.

195. *Id.*

196. *See* Def.'s Ex. XXXX; Def.'s Ex. YYYY.

**302**

THE COURT Well, how long was the receivable that was bought on 10–3–03 outstanding? When was it paid?

THE WITNESS I do not know when it was paid.

THE COURT Do you know when any of the receivables that were represented by the wire transfers that occurred between—I guess all of these are in September and October of 2003, or maybe there's one in December.

THE WITNESS: To January 2004, Your Honor.

THE COURT: And those receivables presumably were all collected by somebody. Who collected these receivables?

THE WITNESS: I believe [the Debtor] did.

THE COURT Why did Trafford collect on them, if the Joseph M. Wortley Trust owned the receivables?

THE WITNESS: It's an informal arrangement. It isn't like a typical factoring agreement.[197]

Mr. Clark and I also had the following exchange regarding the alleged factoring arrangement with the Debtor:

THE COURT: That's all interesting, but I'm asking this witness about the factoring agreement that he's identified as part of Exhibit OOOO, and trying to understand what it was that Mr. Clark's client purchased, because factoring is a purchase of specific invoices, or at the very most, invoices that exist at a particular time.

Are any of the invoices that existed as of January 2004, still outstanding, Mr. Clark?

THE WITNESS: Your Honor, I do not know that.

THE COURT: Tell me the difference between accounts receivable financing, in your mind, and factoring.

THE WITNESS: Your Honor, I believe, my limited knowledge of it is that accounts receivable, you do actually purchase that specific account. I know that there were specific accounts when that was started. Then the accounts were rolled over, specifically Heinz receivables. I really don't do that. I was not the transactional attorney doing this. I was the trustee, Your Honor.

That's just a secured interest in the receivables as I understand it.

THE COURT: It's a security interest in the receivables?

THE WITNESS: Yes, Your Honor.

THE COURT: And the only way you could have a security interest in subsequently generated receivables would be if you had a blanket security interest in accounts receivable; isn't that right?

THE WITNESS: I believe so.

THE COURT: And how do you perfect a blanket security interest in receivables?

THE WITNESS: Well, you file it.

THE COURT: Where do you file it?

THE WITNESS As I found out in this case, it would be in Florida where the debtor is.[198]

At trial, the Defendant also offered a document marked Defendant's Exhibit "B/J" which is an unexecuted document titled Purchase and Sale Agreement. I did not admit it into evidence because it was not executed, but even if it had been admitted, it does not establish ownership of the Heinz Receivable. The Defendant's Ex-

---

**197.** Trial Tr. Vol. II, at 474–75 (08–01759–JKO [DE 186] ).

**198.** *Id.* at 478–79.

hibit "B/J" is dated October 2, 2003, lists nine receivables in the total amount of $65,369.66 with receivable dates ranging from September through October of 2003, and has one attached invoice dated January 1, 2004. Mr. Clark testified that he did not know if any of these receivables were still outstanding or when they were paid.[199] He further testified that he did not collect any receivables and all receivables were collected by the Debtor. The Defendants Exhibit "B/J" in no way relates to the Defendant's claim of ownership in the Heinz Receivable.

Defendant Richard I. Clark, in any of his multiple capacities, has failed to provide any Purchase and Sale Agreements specifically transferring the Heinz Receivable from the Debtor to the Defendant. In fact, the Defendant has failed to provide any documentation or support whatsoever to substantiate his claim that he ever owned the Heinz Receivable, or any other receivables of the Debtor's estate. Further, in the context of the evidence as a whole, I find that Mr. Clark was not only less than credible, but that his actions fit squarely within the larger Wortley plan to drain the bankruptcy estate prior to filing, and thereby leave the NLRB with recourse against an empty shell.

## V. CONCLUSIONS

Based on the foregoing, I conclude that the Debtor's transfers of $218,825.00 to Barbara Wortley were fraudulent transfers pursuant to 11 U.S.C. § 548 and Fla. Stat. § 726.105(1). The Plaintiff may avoid the transfers under 11 U.S.C. § 544(b) and recover the value of the transfers from Barbara Wortley under § 550(a). I further conclude that Barbara Wortley breached her fiduciary duties to the Debtor and its creditors pursuant to Fla. Stat. § § 607.0830(1), 607.0831(1)(a)

and common law and, as a consequence, she caused and increased the Debtor's insolvency resulting in this bankruptcy filing and damages to the Debtor and creditors in excess of $2,305,275.86. I further find that such amount is the appropriate measure of damages for her breach of fiduciary duty to the Debtor and creditors.

Based on the foregoing, I further conclude that the Debtor's transfers of $207,500.02 to Liberty Properties were preferential and fraudulent transfers pursuant to 11 U.S.C. §§ 547 and 548 and Fla. Stat. § 726.105(a). The Plaintiff may avoid the transfers under 11 U.S.C. § 544(b) and recover from Liberty Properties under § 550(a) the value of the transfers. The Court further concludes that the Plaintiff is entitled to turnover from Liberty Properties of the receivable in the amount of $39,554.37. I conclude that the Debtor's transfer of $50,000.00 to Liberty Associates was a fraudulent transfer pursuant to 11 U.S.C. § 548 and the Plaintiff may avoid the transfer under 11 U.S.C. § 544(b) and recover from Liberty Associates under § 550(a) the value of the transfer. I also conclude that the Debtor's transfer of $15,000.00 to Advanced Vehicle Systems was a fraudulent transfer pursuant to 11 U.S.C. § 548 and the Plaintiff may avoid the transfer under 11 U.S.C. § 544(b) and recover from Advanced Vehicle Systems under § 550(a) the value of the transfer.

Finally, based on the foregoing, I find that Defendant Richard I. Clark does not own the Heinz Receivable in any of his multiple alleged capacities. The Plaintiff holds a superior right to the Heinz Receivable, the Heinz Receivable is property of the bankruptcy estate, and the Plaintiff Chapter 7 Trustee is free to administer the Heinz Receivable free and clear of any claim of right, title, lien, or interest by the

---

199. *Id.* at 474–75.

Defendant Richard I. Clark in any of his multiple alleged capacities.

Pursuant to Fed. R. Bankr.P. 7058, and for the reasons stated in these Findings of Fact and Conclusions of Law, I will enter separate final judgments in favor of Chapter 7 Trustee Soneet Kapila in each of the three adversary proceedings. For the reasons stated above, I will by separate order deny the motion for reconsideration of the summary judgment order in adversary proceeding 08–01792–JKO.